**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Daniel I. COLTON, Defendant–**
**Appellant.**

**United States of America,**
**Plaintiff–Appellant,**

v.

**Daniel I. Colton, Defendant–Appellee.**

**Nos. 99–4142, 99–4185.**

United States Court of Appeals,
Fourth Circuit.

Argued: April 3, 2000

Decided: Nov. 3, 2000

---

* Honorable Edward R. Korman, Chief Judge of the United States District Court for the Eastern District of New York, sitting by designation.

**ARGUED:** Walter Estes Dellinger, III, O'Melveny & Myers, L.L.P., Washington, D.C., for Appellant. Dale Preston Kelberman, Assistant United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Brian D. Boyle, Jonathan D. Hacker, O'Melveny & Myers, L.L.P., Washington, D.C., for Appellant. Lynne A. Battaglia, United States Attorney, Baltimore, Maryland, for Appellee.

Before LUTTIG and MOTZ, Circuit Judges, and GODBOLD, Senior Circuit Judge of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.

No. 99–4142 affirmed in part and remanded in part and No. 99–4185 affirmed by published opinion. Judge MOTZ wrote the opinion, in which Judge LITTIG and Senior Judge GODBOLD joined.

DIANA GRIBBON MOTZ, Circuit Judge:

This appeal requires us to determine whether the federal bank fraud statute criminalizes failures to disclose material information to a financial institution only if those failures breach some independent legal disclosure duty. Because the bank fraud statute proscribes any "scheme or artifice to defraud," we hold that, even absent an independent duty to disclose, misleading or deceitful conduct designed to conceal material information from a financial institution violates the statute.

The case at hand arises from loans obtained by appellant, Daniel Colton, and his partner Dennis Laskin to finance certain commercial real estate projects. Colton and Laskin formed a corporation, Colton & Laskin, Inc. (owned by them in equal shares) which in turn created partnerships and corporations that secured a series of substantial loans from various financial institutions. At the time of the events critical to this case, Colton and Laskin had been partners for over six years and had together invested in numerous properties and had pursued thirty to forty development projects. They had defaulted on the real estate loans involved here by the time the challenged transactions took place.

After the government launched an investigation of these transactions, Laskin pled guilty to bank fraud and concealment of assets from the Resolution Trust Corporation (RTC) and admitted his participation in the schemes outlined within. Colton maintained his innocence and went to trial.

Following a three week trial, at which Laskin testified against Colton, a jury convicted Colton of one count of conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 371 and 1334 (1994), based on his conduct with respect to the workout of a loan with the RTC, and three counts of bank fraud in violation of 18 U.S.C. § 1344, based on his conduct with respect to a loan with Second National Bank.

Colton's primary argument on appeal is that because the government offered no evidence that he made any affirmative misrepresentations or breached any fiduciary, statutory, or other independent legal duty to disclose information, he cannot be held to have violated the federal bank fraud statute. We do not agree with this cramped construction of the bank fraud statute, which prohibits any knowing "scheme or artifice . . . to defraud" a financial institution. 18 U.S.C. § 1344. We affirm Colton's conspiracy conviction and one of his substantive bank fraud convictions because the government produced ample evidence from which a reasonable jury could conclude that Colton conspired to execute a scheme or artifice to defraud the RTC and did execute a scheme or artifice to defraud Second National. We must remand the case, however, so that the district court can vacate two of the bank fraud convictions because they were multiplicious.

With respect to the Second National transaction, the government cross appeals. The government maintains that it proved that in the Second National transaction Colton individually derived more than $1,000,000 and so his sentence should have been enhanced. Finding no error in the district court's refusal to enhance Colton's sentence on this ground, we affirm.

We set forth below the factual background of each transaction at issue here, prior to discussing its legality.

I.

We first address Colton's conviction for conspiracy to commit bank fraud. See 18 U.S.C. §§ 371, 1344.

## A.

This conviction rests on certain actions Colton took to defraud the RTC in connection with the workout of a $3.1 million defaulted loan that he and Laskin had originally obtained from Trustbank. Although the government did not charge Colton with any crime in connection with a prior workout of a defaulted loan from Riggs Bank in the amount of $7.725 million, it did offer evidence of the Riggs transaction to demonstrate Colton's "knowledge, intent and motive" with respect to the $3.1 million RTC loan. Accordingly, we first briefly outline the Riggs transaction.

### 1.

Colton and Laskin, along with other developers, obtained the Riggs loan in 1988 to finance a joint venture near Annapolis, Maryland. All of the partners involved in the venture personally guaranteed the loan. In March 1991, the partners contracted to sell the property to Wal–Mart for $10 million subject to certain conditions. However, a few months later, some of the partners experienced financial difficulties and the loan went into default.

Before the joint venture began experiencing difficulties, Laskin formed an irrevocable trust for the benefit of his family in January 1991, naming his long-time accountant, Alex Brager, his long-time lawyer, Ellis Koch, and Victor Rosenberg as trustees. Laskin used $10 million of his personal assets to establish the trust, which was originally titled the Dennis A. Laskin Irrevocable Trust. On August 26, 1991, after Colton and Laskin had defaulted on the Riggs loan (and the RTC loan), Laskin arranged for papers to be filed with the state to permit the trust to trade as the Alexander Family Trust (the "Trust"), and he removed Ellis Koch as a trustee because Koch was known to be closely associated with him.

Once the loan for the joint venture went into default, Riggs looked to the personal guarantors, including Colton and Laskin, for payment because Riggs believed that the property value was insufficient to cover the loan in light of certain environmental and financial problems jeopardizing the Wal–Mart contract. At Colton's recommendation, Laskin contacted Marvin Mandel, a former Governor of Maryland, who was now practicing law in Annapolis, to represent the Trust in negotiations with Riggs to purchase the note. Colton and Laskin intentionally failed to provide Mandel with any "of the particulars" of the Trust, including a copy of the trust agreement or even the identities of the grantor or the beneficiaries of the Trust. Laskin testified that "[t]he purpose in using Marvin Mandel was, first of all, based upon his credibility as the former governor, and secondly, so that Riggs would not be aware that the funds were coming from my trust."

During the negotiations, Riggs sought, but did not receive, additional information about the Trust, including the identities of the grantor and the beneficiaries. Laskin explained that he and Colton did not want to reveal this information because if Riggs knew of Laskin's relationship to the Trust, the bank "would not sell the loan at a discount" but rather would seek full payment. Riggs ultimately accepted Colton and Laskin's certifications that they did not have a direct or indirect interest in the Trust, as well as Mrs. Laskin's limited certification that she had no "legal or beneficial interest in the Trust with respect to" its acquisition of the note. Riggs then sold the $7.725 million note to the Trust for approximately $5 million in November 1991. According to the government, Colton and Laskin used this transaction as a blueprint for devising their plan to defraud the RTC by the conduct outlined below, which forms the basis for the conspiracy count against Colton.

### 2.

The RTC loan had originally been made in January 1990 by Trustbank, a federally

insured bank, to Colton and Laskin for the acquisition and development of property near Bowie, Maryland. The loan totaled $3.1 million and was personally guaranteed by Colton, Laskin, and their wives. In March 1991, Wal–Mart contracted with Colton and Laskin to purchase part of this property as well, conditioned upon certain development requirements, including county-mandated road improvements. Negotiations with commercial neighbors over such improvements reached an impasse, however, and Colton and Laskin defaulted on the loan with Trustbank in June 1991.

The RTC had placed Trustbank into conservatorship in January 1991. The RTC hired Gemini Asset Managers to work out and liquidate the bank's assets, including Colton and Laskin's $3.1 million loan. Gemini sent a letter to Colton and Laskin on November 12, 1991, informing them that Gemini had taken over management and disposition of their loan. In assessing its options for recovering the loan, Gemini evaluated the personal financial condition of Colton, Laskin, and their wives, and concluded that recovery through the personal guarantees was not a viable option because substantial liabilities outweighed the value of the guarantors' assets.

Laskin testified that "[b]ased upon the success of acquiring the note with Riggs Bank at a discount, it was Mr. Colton's suggestion that the trust acquire the note from Trustbank at a discount as well." However, "there would be one change"— "[b]ecause of the difficulties that were encountered with the acquisition of the Riggs note with [Riggs'] request for information . . . , it was decided to use another corporation to acquire the note other than the trust." Accordingly, in January 1992, Laskin contacted Gemini to discuss the possibility of selling the note to an unnamed interested investor. Once again, Colton and Laskin, on behalf of the Alexander Family Trust, retained Mandel to negotiate the sale of the note at a discount, and once again they did not give Mandel any details about the Trust.

After obtaining its own appraisals, Gemini concluded that the value of the property was only $900,000 and that the Wal–Mart sale was unlikely to go forward in the absence of cooperation from the other commercial neighbors with respect to the road improvements, and so it deemed a sale of the note to a third party investor to be its best option. The parties agreed that the price to be paid for Colton and Laskin's $3.1 million note would be $1.5 million. Once this purchase price was settled, Laskin asked Stanley Jacobs, who had previously performed legal work for Colton and Laskin, to act as the settlement attorney for this transaction and to form a corporation to purchase the note from the RTC. Jacobs said he had an existing shell corporation, New Homes, Inc., and it was agreed that New Homes would buy the note. Neither Colton nor Laskin told Jacobs the source of the financing or provided him with any details about the transaction.

According to Laskin, "[t]he RTC was not made aware of the fact that the trust was funding the acquisition." Mandel, however, testified that the RTC did know that "the Alexander Family Trust [was] involved," and that, as in the Riggs deal, he provided the lender with Victor Rosenberg's name as trustee and contact person. Yet, Mandel also testified that as the time of sale drew closer he informed the RTC, through Gemini, that New Homes would purchase the note and provided Jacobs' name as the contact person for New Homes. Unlike Riggs, Gemini did not request additional information or seek express certifications from Colton and Laskin, or their wives, as to any interest they may have had in the entity purchasing the note.

However, the RTC did require Jacobs, as President of New Homes, to sign a Loan Sale Agreement with the RTC, which includes a certification that the purchaser "ha[d] not . . . caused a loss in excess of

$50,000 to any insured depository institution." After $1.5 million was wire transferred from the Trust to Jacobs' bank account, Jacobs signed the Loan Sale Agreement on behalf of New Homes and the sale closed on June 30, 1992.

Through Colton's efforts, the necessary road improvements and other conditions of the Wal–Mart contract were satisfied, and on the very same day that New Homes purchased the note, June 30, 1992, Colton and Laskin sold the property to Wal–Mart for $3.59 million. From those proceeds, Colton and Laskin paid New Homes $1.5 million to cover the purchase price of their note from the RTC, plus interest, a profit, and fees, which New Homes in turn paid to the Trust. Colton and Laskin took a cut from the remainder of the Wal–Mart proceeds and also paid other fees and employee bonuses.

Laskin explicitly acknowledged at trial that he had "an agreement or understanding" with Colton "to conceal from the Resolution Trust Corporation the use of [the] trust funds through New Homes, Inc. to purchase the RTC note. . . ."

### B.

The bank fraud statute provides in pertinent part:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> 1) to defraud a financial institution; or
>
> 2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344. The government concedes that Colton and Laskin made no affirmative misrepresentations to the RTC with respect to the disposition of their defaulted loan. We therefore assess Colton's criminal liability under § 1344(1). *See, e.g., United States v. Celesia,* 945 F.2d 756, 758 (4th Cir.1991) ("[C]ourts have construed Section 1344's provisions disjunctively, so that one may commit a bank fraud under Section 1344(1) by defrauding a financial institution, without making the false or fraudulent promises required by Section 1344(2)."); *United States v. Goldsmith,* 109 F.3d 714, 716 (11th Cir.1997) (adopting same construction of § 1344).

According to Colton, because he had no fiduciary, statutory, or other independent legal duty to disclose to the RTC any of the information he and Laskin withheld, he cannot be guilty of "a scheme or artifice to defraud" the RTC. Colton admits he did not volunteer certain information, but he characterizes his conduct as "a series of lawful acts intended to obtain a favorable result in an impersonal market transaction." Brief of Appellant at 42. The government, on the other hand, also recognizing that Colton and Laskin had no independent legal duty to disclose, contends that, even so, the partners purposefully concocted a scheme, executed through various affirmative acts, to conceal material information with the intent to mislead the RTC, and that such conduct constitutes "a scheme or artifice to defraud," in violation of the bank fraud statute. 18 U.S.C. § 1344. We agree with the government's reading of the statute.

Section 1344 was intended to fill in "serious gaps . . . in Federal jurisdiction" in order to ensure the effective prosecution of fraudulent schemes targeted at financial institutions. S.Rep. No. 98–225, at 377 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3517. It was "modeled on the . . . wire [18 U.S.C. § 1343] and mail [18 U.S.C. § 1341] fraud statutes," which, Congress noted, the courts had construed broadly. S.Rep. No. 98–225, at 378, *reprinted in* 1984 U.S.C.C.A.N. at 3519.

Indeed, more than one hundred years ago, the Supreme Court, construing the

mail fraud statute, rejected a narrow interpretation of the phrase "any scheme or artifice to defraud" that would have confined the statute's reach to "such cases as, at common law, would come within the definition of 'false pretenses,'" such as cases involving an actual misrepresentation of a material fact. *Durland v. United States*, 161 U.S. 306, 312, 16 S.Ct. 508, 40 L.Ed. 709 (1896). Rather, *Durland* held that the statute "includes everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future. The significant fact is the intent and purpose." *Id.* at 313, 16 S.Ct. 508. Other Supreme Court cases interpreting statutes that prohibit "fraud" or schemes "to defraud" have similarly accorded those terms broad meaning. *See Haas v. Henkel*, 216 U.S. 462, 479, 30 S.Ct. 249, 54 L.Ed. 569 (1910) (interpreting a predecessor statute to 18 U.S.C. § 371); *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 68 L.Ed. 968 (1924) (same); *see also McNally v. United States*, 483 U.S. 350, 374, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) (Stevens, J., dissenting) ("The general language in the mail fraud statute has repeatedly been construed to cover novel species of fraud, and Congress has repeatedly amended the statute in ways that support a broad interpretation of its basic thrust.").[1]

The Supreme Court has recently articulated an outer boundary for the interpretation of the federal fraud statutes. *See Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). In *Neder*, the Court rejected the government's argument that "Congress chose to unmoor the mail fraud statute from its common-law analogs" and thus did not intend for materiality to be an element of the offense. *Id.* at 23–24, 119 S.Ct. 1827.

The Court instead pointed out that because the mail, wire, and bank fraud statutes do not define the phrase "scheme or artifice to defraud," courts interpreting the statutes must infer that Congress implicitly incorporated the common-law meaning of the relevant terms. *Id.* at 20–22, 119 S.Ct. 1827. Most significantly for our purposes, the *Neder* Court clarified its earlier holding in *Durland*, explaining that "[a]lthough *Durland* held that the mail fraud statute reaches conduct that would not have constituted 'false pretenses' at common law, it did not hold, as the Government argues, that the statute encompasses more than common-law fraud." *Id.* at 24, 119 S.Ct. 1827.

■ Accordingly, in interpreting the bank fraud statute, we look to the common-law understanding of fraud. At common law, fraud has not been limited to those situations "where there is an affirmative misrepresentation or the violation of some independently-prescribed legal duty," as Colton contends. Reply Brief at 15. Rather, even in the absence of a fiduciary, statutory, or other independent legal duty to disclose material information, common-law fraud includes acts taken to conceal, create a false impression, mislead, or otherwise deceive in order to "prevent[ ] the other [party] from acquiring material information." Restatement (Second) of Torts § 550 (1977); *see also* W. Page Keeton et al., *Prosser and Keeton on Torts* § 106 (5th ed. 1984) ("Any words or acts which create a false impression covering up the truth, or which remove an opportunity that might otherwise have led to the discovery of a material fact ... are classed as misrepresentation, no less than a verbal assurance that the fact is not true.").

---

1. *McNally* held that a "scheme or artifice to defraud," as used in the mail fraud statute, was "limited in scope to the protection of property rights" and thus, the statute did not prohibit schemes to deprive people of the intangible right to good government and honest services. 483 U.S. at 360, 107 S.Ct. 2875.

In response to *McNally*, Congress enacted 18 U.S.C. § 1346 (1994), which states that "[f]or the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."

 Thus, fraudulent concealment—without any misrepresentation or duty to disclose—can constitute common-law fraud. This does not mean, however, that simple nondisclosure similarly constitutes a basis for fraud. Rather, the common law clearly distinguishes between concealment and nondisclosure. The former is characterized by deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter. The latter is characterized by mere silence. Although silence as to a material fact (nondisclosure), without an independent disclosure duty, usually does not give rise to an action for fraud, suppression of the truth with the intent to deceive (concealment) does. *See, e.g., Stewart v. Wyoming Cattle Ranche Co.,* 128 U.S. 383, 388, 9 S.Ct. 101, 32 L.Ed. 439 (1888).

 The Supreme Court in *Stewart* carefully explained why concealment is "equivalent to a false representation" and so appropriately forms the basis for a common law fraud action: "the concealment or suppression is in effect a representation that what is disclosed is the whole truth. The gist of the action is fraudulently producing a false impression upon the mind of the other party; and if this result is accomplished, it is unimportant whether the means of accomplishing it are words or acts of the defendant, or his concealment or suppression of material facts not equally within the knowledge or reach of the plaintiff." 128 U.S. at 388, 9 S.Ct. 101; *see also Udell v. Atherton,* 158 Eng. Rep. 437 (Ex. 1861); *Schneider v. Heath,* 3 Campb. 506 (1813); 37 C.J.S. *Fraud* § 18 (1997) (distinguishing between silence and concealment); 37 Am.Jur.2d *Fraud and Deceit* § 145 (1968) (same). Thus, the common-law principle that, in the absence of

an independent disclosure duty, "nondisclosure is not fraudulent, presupposes mere silence, and is not applicable where, by words or conduct, a false representation is intimated or any deceit practiced." *Id.* at § 174 (and the many cases cited therein); *see also* Stuart M. Speiser et al., 9 *The American Law of Torts* § 32:73 (1992).

Indeed, we have expressly held that the distinction between simple nondisclosure and concealment "is in accord with traditional principles of common law fraud." *Fox v. Kane–Miller Corp.,* 542 F.2d 915, 919 (4th Cir.1976). In *Fox,* we upheld the district court's reliance on the following explanation of this principle by Maryland's highest court:

> Concealment and non-disclosure are closely related and in any given situation usually overlap.... "When[either is] done without intent to mislead and without misrepresentation, it has no effect except where there is a duty of disclosure...." To create a cause of action, concealment must have been intentional and effective—the hiding of a material fact with the attained object of creating or continuing a false impression as to that fact. The affirmative suppression of the truth must have been with intent to deceive.

*Fegeas v. Sherrill,* 218 Md. 472, 147 A.2d 223, 225 (1958) (quoting Restatement of Restitution § 8 cmt. b (1937) and citing Restatement of Torts § 550 (1938)). Given this "close[ ] relat[ionship]" between nondisclosure and concealment, numerous decisions expressly distinguish between passive concealment—mere nondisclosure or silence—and active concealment, which involves the requisite intent to mislead by creating a false impression or representation, and which is sufficient to constitute fraud even without a duty to speak.[2]

2. *See, e.g., Hitachi Credit Am. Corp. v. Signet Bank,* 166 F.3d 614, 629 (4th Cir.1999) (interpreting Virginia law); *Mudd v. Lanier,* 247 Ala. 363, 24 So.2d 550, 562–63 (1945); *Farm Bureau Policy Holders & Members v. Farm Bureau Mut. Ins. Co.,* 335 Ark. 285, 984 S.W.2d 6, 14–15 (1998); *Younan v. Equifax*

*Inc.,* 111 Cal.App.3d 498, 169 Cal.Rptr. 478, 487 (1980); *Franklin v. Brown,* 159 So.2d 893, 898 (Fla.App.1964); *H.E.P. Dev. Group, Inc. v. Nelson,* 606 A.2d 774, 775 (Me.1992); *Scharf v. Tiegerman,* 166 A.D.2d 697, 561 N.Y.S.2d 271, 272 (1990) (quoting *Haberman v. Greenspan,* 82 Misc.2d 263, 368 N.Y.S.2d

▉ In short, at common law, no fiduciary relationship, no statute, no other independent legal duty to disclose is necessary to make active concealment actionable fraud—simple "good faith" imposes an obligation not to purposefully conceal material facts with intent to deceive. *Strong v. Repide,* 213 U.S. 419, 430, 29 S.Ct. 521, 53 L.Ed. 853 (1909); *Tyler v. Savage,* 143 U.S. 79, 98, 12 S.Ct. 340, 36 L.Ed. 82 (1892); *Stewart,* 128 U.S. at 388, 9 S.Ct. 101.[3]

Federal courts have properly recognized and applied this common-law understanding of fraud in construing the federal fraud statutes. In fact, in *United States v. Coyle,* 943 F.2d 424 (4th Cir.1991), we rejected an argument, virtually identical to Colton's, that nondisclosure absent an independent disclosure duty can never constitute fraud. Coyle was convicted of mail fraud for selling cable television equipment that enabled interception of transmissions without payment to (or authorization of) cable companies, in violation of the Communications Act. Because Coyle made no misrepresentations or false promises to the cable companies, and because he had no fiduciary duty to the companies or statutory disclosure duty under the Communications Act, he maintained that he could not be convicted of mail fraud. He contended, as Colton does, that to prove a fraudulent scheme the government had to establish "one of the following ... '(1) affirmative misrepresentations of existing fact, (2) false promises as to the future, (3) the failure of a fiduciary to make disclosure, and (4) the failure to make disclosure under an independent statutory duty.'" *Id.* at 426. We refused to adopt this rule, explaining that "[t]he mail fraud statute is not as restrictive as Coyle contends." *Id.* at 427. In fact, we expressly held that because Coyle's conduct, proscribed by the Communications Act, constituted a scheme or artifice to defraud cable companies of their property interest in cable programming revenues, it was "immaterial that [the Communications Act] ha[d] no requirement for disclosure." *Id.* at 427.

Our sister circuits have similarly recognized that although the existence of an independent disclosure duty "is relevant and an ingredient" in some fraud prosecutions, such a duty is "not an essential in all

717, 720–21 (1975)); *Crabbe v. Freeman,* 160 N.E.2d 583, 585–86 (1959); *Paul v. Kelley,* 42 Or.App. 61, 599 P.2d 1236, 1238–39 (1979); *Kase v. French,* 325 N.W.2d 678, 683–84 (S.D. 1982).

Other courts do not explicitly distinguish between active and passive concealment, and refer generally to fraudulent concealment as a synonym for nondisclosure requiring an independent duty of disclosure to be actionable. *See, e.g., Lone Star Indus. v. Compania Naviera Perez Companc (In re New York Trap Rock Corp.),* 42 F.3d 747, 754 (2d Cir.1994); *Emmett v. Eastern Dispensary & Cas. Hosp.,* 396 F.2d 931, 937–38 n. 33 (D.C.Cir.1967); *City of Rome v. Glanton,* 958 F.Supp. 1026, 1038 (E.D.Pa.1997); *Altmayer v. City of Daphne,* 613 So.2d 366, 369 (Ala.1993); *Mallon Oil Co. v. Bowen/Edwards Assocs.,* 965 P.2d 105, 111 (Colo.1998); *Allen v. Layton,* 235 A.2d 261, 264 (Del.Super.Ct.1967); *Albany Urology Clinic, P.C. v. Cleveland,* 272 Ga. 296, 528 S.E.2d 777, 780 (2000); *DeVoe Chevrolet–Cadillac, Inc. v. Cartwright,* 526 N.E.2d 1237, 1240 (Ind.Ct.App.1988); *Parker v. Columbia Bank,* 91 Md.App. 346, 604 A.2d 521, 531 (1992); *Dow Chem. Co. v. Mahlum,* 114 Nev.

1468, 970 P.2d 98, 110–11 (1998). Although the nomenclature used in these latter cases is not as clear as it might be, the cases still offer Colton no support because they do not suggest, let alone hold, that "active concealment," i.e., with the requisite intent and misleading impression, is not actionable in the absence of an independent disclosure duty.

3. Some courts have refined this "good faith" concept by accounting for the fluid nature of the bargaining relationship and holding that a duty to disclose may arise from the circumstances surrounding nondisclosure, such as when a defendant engages in some conduct, beyond mere silence, that rises to the level of active concealment. *See, e.g., United States v. Benny,* 786 F.2d 1410, 1418 (9th Cir.1986); *Bethka v. Jensen,* 250 A.D.2d 887, 672 N.Y.S.2d 494, 495 (1998); *cf. Meade v. Cedarapids, Inc.,* 164 F.3d 1218, 1222 (9th Cir. 1999) ("[O]ne who makes a representation that is misleading because it is in the nature of a 'half-truth' assumes the obligation to make a full and fair disclosure of the whole truth." (quoting *Gregory v. Novak,* 121 Or. App. 651, 855 P.2d 1142, 1144 (1993))).

such cases." *United States v. Allen,* 554 F.2d 398, 410 (10th Cir.1977); *see also United States v. Keplinger,* 776 F.2d 678, 697–98 (7th Cir.1985) ("It requires no extended discussion of authority to demonstrate that omissions or concealment of material information ... can constitute fraud cognizable under the mail fraud statute, without proof of a duty to disclose the information pursuant to a specific statute or regulation [or arising from a fiduciary relationship]."); *see also United States v. Townley,* 665 F.2d 579, 585 (5th Cir.1982) ("[S]tatements need not be false or fraudulent on their face, and the accused need not misrepresent any fact, since all that is necessary is that the scheme be reasonably calculated to deceive....").

 Of course, the "fraud statutes do not cover all behavior which strays from the ideal," *United States v. Brown,* 79 F.3d 1550, 1562 (11th Cir.1996), and "[n]ot all conduct that strikes a court as sharp dealing or unethical conduct is a 'scheme or artifice to defraud.'" *Reynolds v. East Dyer Dev. Co.,* 882 F.2d 1249, 1252 (7th Cir.1989). However, "active or elaborate steps to conceal" information can constitute such a scheme. *Id.* at 1253; *see also Keplinger,* 776 F.2d at 697–98 ("Obviously, we do not imply that all or even most instances of non-disclosure of information that someone might find relevant come within the purview of the mail fraud statute; nevertheless, under some circumstances concealment of material information is fraudulent."). Concealment often is accompanied by an affirmative misrepresentation or a violation of an independent statutory or fiduciary disclosure duty, but neither is "essential" for actionable fraud. *Allen,* 554 F.2d at 410. What is essential is proof of a "scheme or artifice to defraud," which can be shown by deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or avert further inquiry into a material matter.

Applying this common-law understanding of fraudulent concealment, we agree with the government that Colton and Laskin's course of conduct reveals a scheme or artifice to defraud the RTC by actively seeking ways to hide, mask, or divert attention away from the fact that Laskin was the grantor of the Alexander Family Trust, to foster the false impression that the RTC was dealing with an independent third party investor, and otherwise to mislead the RTC in negotiating the sale of Colton and Laskin's note at a substantial discount. Here, as in *United States v. Aubin,* 87 F.3d 141, 146 (5th Cir.1996), the "very structure of the transaction would allow a reasonable inference of an intent to defraud."

*Aubin* involved facts substantially similar to those in the present case. Aubin used a land flip to obtain financing from a savings and loan to purchase a $22 million horse farm. Aubin owned a controlling interest not only in the "flipped" property but also in the entity that sought the loan to buy the horse farm; he concealed his relationship with both of these businesses from the lender. The Fifth Circuit had no difficulty in affirming the bank and wire fraud convictions, finding that "[t]he evidence clearly indicate[d] that the parties knew they had to conceal the true nature of the transaction from federal regulators if the scheme was to succeed." *Id.* at 147.

Similarly, in the case at hand, a jury reasonably could infer that Colton and Laskin knew, based on the earlier transaction with Riggs Bank, that the RTC would be reluctant to sell the note for less than fifty percent of its value if it knew of Laskin's relationship to the Trust, and that Colton and Laskin thus had engaged in an elaborate scheme to conceal that information. We reject Colton's argument that the government should have been required to prove that he had an independent legal duty to disclose the information he concealed, for the same reason that the Fifth Circuit rejected Aubin's identical argument:

> [T]he government's case was not based on a mere failure to disclose; instead, it was based on affirmative concealment

intended to defraud. The government produced evidence of actions designed purposely to conceal the details of the transaction and Aubin's involvement. . . .
*Id.* at 148.

Contrary to Colton's contentions, *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), suggests no other rule. In *Chiarella,* a printer, who had access to confidential documents concerning corporate takeover bids, was convicted of securities fraud in violation of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), for purchasing stock in the target companies without disclosing the material, nonpublic information. The Supreme Court reversed, distinguishing the printer from a corporate insider whose fiduciary relationship with the corporation's stockholders gives rise to a duty to disclose. Colton heavily relies on *Chiarella;* that reliance is misplaced.

First, critical to the *Chiarella* holding was the fact that it involved charges of securities fraud. Given Congress's comprehensive and detailed regulation of the field of securities law, the Court was understandably reluctant to construe the securities fraud statute broadly:

> Congress' careful action in [the operation of securities markets] . . . contrasts, and is in some tension, with the broad rule of liability we are asked to adopt in this case. . . . We hold that a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information. The contrary result is without support in the legislative history of § 10(b) and would be inconsistent with the careful plan that Congress has enacted for regulation of the securities markets.

445 U.S. at 233–35, 100 S.Ct. 1108; *see also United States v. O'Hagan,* 521 U.S. 642, 659, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997) (holding that misappropriation theory is a basis for finding criminal liability under § 10(b) in light of "the inhibiting impact on market participation of trading on misappropriated information, and the congressional purposes underlying § 10(b)"). The case at hand, of course, involves not the securities fraud statute but the bank fraud statute, which, as explained above, Congress intended to be construed broadly. *See* S.Rep. No. 98–225, at 378, *reprinted in* 1984 U.S.C.C.A.N. at 3519.

Perhaps even more importantly, the underlying assertedly criminal activity involved in *Chiarella* is far removed from that at issue here. *Chiarella* involved mere silence, or nondisclosure, 445 U.S. at 232–33, 100 S.Ct. 1108, and in that context, the Court unexceptionally noted that "[a]t common law, . . . one who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so." *Id.* at 227–28, 100 S.Ct. 1108. It does not appear that any allegation of active concealment was lodged against Chiarella. The instant case, on the other hand, involves not just concealment with intent to defraud by producing false impressions, but a conspiracy to perpetuate an elaborate and deceitful scheme reaping the conspirators approximately $1.6 million.

*Chiarella* "addresses the obligations of one who seeks to benefit personally from nonpublic corporate information. It does not apply to those . . . who seek to benefit personally from an *illegal,* self-created scheme." *United States v. Russo,* 74 F.3d 1383, 1391–92 (2d Cir.1996) (distinguishing between market manipulation and insider trading, and rejecting defendants' argument "that they had no duty to disclose their deceit to the market"). Colton and Laskin, in contrast to Chiarella, did "seek to benefit personally" from "an illegal, self-created scheme" to defraud the RTC. Their purpose to conceal, deceive, and mislead was built into the business arrangement they devised and executed. Even one of the cases upon which Colton relies recognizes that in these circumstances, wholly "apart from a fiduciary duty, . . . 'a misleading omission[ ] is actionable as

fraud'" because "'it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled.'" *United States v. Cochran,* 109 F.3d 660, 665 (10th Cir.1997) (quoting *Emery v. American Gen. Fin., Inc.,* 71 F.3d 1343, 1348 (7th Cir.1995)).

■ Colton's reliance on the RTC's failure to request additional details about the Trust or New Homes is as misplaced as his reliance on *Chiarella.* The susceptibility of the victim of the fraud, in this case a financial institution, is irrelevant to the analysis: "If a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright. These are criminal statutes, not tort concepts." *United States v. Brien,* 617 F.2d 299, 311 (1st Cir.1980);[4] *see also Neder,* 527 U.S. at 24–25, 119 S.Ct. 1827 (holding that "reliance" and "damages" are not necessary elements of an offense under the federal fraud statutes); *United States v. Stewart,* 872 F.2d 957, 960 (10th Cir.1989) (same); Speiser et al., *supra,* § 32.73 ("[T]he rule that fraud cannot be predicated on a failure to disclose facts where ... the truth may be ascertained by the exercise of reasonable diligence does not justify a resort to active deceit or fraud.").

■ We also find unpersuasive Colton's contention that rejecting his position would be to construe "the federal fraud statutes ... as prohibiting conduct that is nowhere specified or defined in the law." Reply Brief at 15. Our holding today imposes no "unspecified affirmative duties of disclo-

sure," Brief of Appellant at 26, nor prohibits "undefined activities," *Chiarella,* 445 U.S. at 235 n. 20, 100 S.Ct. 1108, that would raise questions about fair notice for criminal defendants. Rather, our holding recognizes and adheres to the congressional intent and established precedent that the language of the bank fraud statute be broadly construed so as to reach anyone engaged in a scheme or artifice to defraud, including a scheme to actively conceal material information through deceptive conduct, with the intent to mislead and suppress the truth, even in the absence of an independent legal duty to disclose such information.[5]

■ The government presented ample evidence for a reasonable jury to find Colton guilty of conspiring to engage in a scheme or artifice to defraud the RTC. The jury could have found that Colton and Laskin, as equal partners, conferred on and agreed to all important decisions regarding their joint real estate investments. When the real estate loans guaranteed by Colton and Laskin began to go sour, Laskin funded an irrevocable family trust, in part to create a vehicle to preserve the partners' interests in their investments. In the next few months, as financial difficulties worsened, Laskin arranged for the Trust to operate under a new name and removed his long-time lawyer as trustee so as to dissociate himself with the Trust. In so doing, he and Colton were able to free themselves of their guarantor responsibilities to their lenders by having the Trust purchase their notes at a cut rate without the knowledge of any of the lenders. Af-

---

4. Moreover, as the legislative history of the bank fraud statute indicates, Congress chose to extend special protection to financial institutions:

 [T]he scope of present Federal statutes is not sufficient to assure effective prosecution of the range of fraudulent crimes commonly committed today against federally controlled or insured financial institutions. The legislative proposal ... would meet the need for a statutory basis for asserting Federal jurisdiction over such offenses and

would thereby better assure the integrity of the Federal banking system.
S. Rep. No. 98–225, at 379, *reprinted in* 1984 U.S.C.C.A.N. at 3519.

5. It is important to bear in mind that the government must also prove a defendant's intent to defraud and the materiality of the information concealed, i.e., what a reasonable financial institution would want to know in negotiating a particular transaction. *See infra* n. 6.

ter Colton and Laskin arranged to have the Trust, represented by former Governor Mandel, purchase their Riggs note at a substantial discount, Colton suggested that they again use Trust funds and again enlist Mandel to act as an intermediary to purchase their RTC note. A jury could reasonably infer that Colton and Laskin hired Mandel to represent the Trust in order to create the false impression that the Trust was an independent third party investor (or at least deflect any suspicion that it was not).

The jury could further have found that, based on the previous transaction with Riggs, Colton and Laskin knew that the RTC might seek additional information about the Trust, including the identities of its grantor and beneficiaries, before agreeing to sell their note. Accordingly, they provided Mandel with little information about the Trust. Moreover, to avoid questions as to the Trust and its source of funds, Colton and Laskin obtained the services of yet another attorney, Stanley Jacobs, and requested that he form a corporation to buy the note. After Jacobs agreed to use a shell corporation, New Homes, Inc., for the transaction, Colton and Laskin purposefully did not provide Jacobs with any details about the transaction or about the source of the financing for the purchase of the note. Although Mandel testified that the RTC knew that the Trust "was involved in the sale," the jury could have concluded based on Laskin's testimony and other evidence, that the RTC did not know that the Trust funded the purchase and that Colton and

Laskin used New Homes to conceal Laskin's relationship with the Trust and to suggest falsely to the RTC that it was dealing with an independent third party purchaser. The jury could have found that Colton and Laskin attempted to prevent further inquiry into a matter that they knew the RTC would deem material in its decision to sell the loan and to avoid a potential express misrepresentation in signing the Loan Sale Agreement.[6]

 In sum, to prove conspiracy to commit bank fraud, the government need not demonstrate that defendants who successfully and intentionally engaged in a fraudulent scheme to actively conceal material facts from a financial institution had an independent duty to disclose such facts. Rather, evidence of such a scheme in and of itself suffices. In this case the government clearly offered sufficient evidence that Colton and Laskin conspired in a scheme or artifice to suppress material facts and to foster a misleading or false impression regarding the Alexander Family Trust in order to defraud a financial institution and obtain for themselves a $1.6 million windfall. Therefore, we affirm Colton's conspiracy conviction.[7]

## II.

Having affirmed Colton's conviction for conspiracy to commit bank fraud, we now turn to his convictions for the substantive crime of bank fraud, all of which are based on a different transaction.

---

**6.** We recognize that Laskin (and Colton) did not have legal control over the Trust's assets, that Mandel gave the RTC names of persons to contact for more information about the Trust and about New Homes, and that the RTC did not seek additional information. Moreover, the government did not elicit testimony conclusive as to whether the RTC would have sold the note to New Homes for $1.5 million if it had known that the Trust for which Laskin was the grantor funded the purchase. But these considerations relate either to reliance and damages—which are not required elements for an offense under

§ 1344—or to intent and materiality, issues on which the jury was properly instructed, and which Colton does not challenge on appeal.

**7.** For the same reasons, we reject Colton's additional argument that the district court erred in refusing to instruct the jury that absent "an affirmative misrepresentation, the federal offense of bank fraud requires proof of the violation of some independent legal duty." Brief of Appellant at 47.

## A.

In 1989, another Colton and Laskin entity, Marlborough C.L., Inc., obtained a $20 million loan from Second National FSB to acquire and develop 135 acres located near a planned metro station in Prince George's County, Maryland (the Riverside property). Marlborough secured this loan with a promissory note, which was to mature in May 1992, and a security agreement and deed of trust on the property; Colton and Laskin personally guaranteed the note. The loan agreement included a "partial release" clause to ensure that Second National would receive a percentage of the net proceeds for each commercial parcel of the Riverside property sold as payment toward the balance of the loan:

> Lender agrees to grant such partial releases [of a portion of the Riverside property] upon payment of 85% of the net proceeds of sale of the parcel of the Property to be released, or upon payment of such amount as is computed by multiplying 115% of 80% of the value associated with the parcel being released, whichever amount is greater.

Access and road improvement problems frustrated effective commercial development of the property. To alleviate these problems, Colton and Laskin pursued a number of options prior to defaulting on the loan, including negotiations with the University of Maryland. These negotiations involved the sale of a parcel of the Riverside property to the American Center for Physics (ACP), as well as land exchange proposals that centered on a university-owned, 19–acre tract (the University tract) adjacent to the Riverside property that Colton and Laskin, through Marlborough, had previously contracted to purchase. The negotiations first led to a Land Exchange Agreement, executed on May 21, 1991, in which Colton and Laskin agreed, on behalf of Marlborough, to swap 10 acres of developed Riverside property for 14.2 undeveloped acres of the University tract. In that Agreement, both parties represented that they would have "full

and clear title to the land deeded" at the time the deeds were to be granted.

At some point during the next year, Prince George's County contacted Marlborough, as contract purchaser of a portion of the University tract, to express the County's interest in acquiring 6.4 acres of that tract in order to construct a replacement parking lot for an industrial facility. Marlborough, the County, and the University negotiated the following three-way land swap. Colton and Laskin's Marlborough corporation would transfer to the University 13.2 acres of the Riverside property, which the University intended to develop for housing. The University would transfer to Marlborough an 8.8–acre portion of the University tract, which provided better road access to the Riverside property. The University and Marlborough (as contract purchaser) would then transfer to the County approximately 6.4 acres of the University tract; and the County would pay Marlborough $2.1 million to give up its rights to that parcel, conditioned upon Marlborough's agreement to complete certain road improvements.

By June 1992, the Riverside loan was in default; Marlborough (and Colton and Laskin, as guarantors) owed Second National more than $21.75 million in principal and unpaid interest. As the ACP deal reached fruition, Colton and Laskin's attorney, Ellis Koch, prepared the various deeds related to the land swap arrangement. In Colton and Laskin's discussions with Second National, they presented not only the ACP deal but also the land exchange proposal with the University; they represented the latter to the bank as a swap of 13.2 acres of Riverside property in exchange for 8.8 acres of University property. Colton and Laskin never told Second National about the anticipated $2.1 million payment to Marlborough from the County in exchange for the 6.4–acre parcel of University property, even though Marlborough acquired the 6.4 acres only by giving up property in which the bank had a

security interest. After conducting its own independent appraisals and concluding that the exchange proposed by Colton and Laskin increased the value of its overall collateral in the Riverside property—primarily because it provided essential northern access—Second National agreed to accept the 8.8–acre parcel of University property as substitute collateral for the 13.2 acres of Riverside property.

On June 29, 1992, Second National executed a Modification and Forbearance Agreement with Marlborough, Colton, and Laskin that acknowledged the default status of the loan. The Agreement noticed Second National's obligation to grant a partial release of the Riverside property to be sold to the ACP and specified the use of the settlement proceeds from the ACP deal. The Agreement also provided:

> [T]he Bank will cause the release from the lien of the Deed of Trust of that land which is to be contemporaneously exchanged with the University of Maryland in exchange for the land received from the University of Maryland adjacent to the College Park Metro site.... Saving and excepting that portion of the lands granted to Prince George's County and/or any other public agency for roads and public improvements. Said partial release shall be contemporaneous with the inclusion of the newly acquired land as part of the property encumbered by the Deed of Trust, free and clear of any other liens....

Four months later, on October 28, 1992, the University deeded 8.8 acres to Marlborough, and Second National executed a Deed of Trust Modification Agreement and a Partial Deed of Release of the 13.2 acres of Riverside property in exchange for the 8.8 acres acquired from the University to be encumbered by the Deed of Trust.

A week earlier, on October 19, 1992, Marlborough had entered into an Agreement with Prince George's County that included, among other obligations, the County's $2.1 million payment to Marlborough for its rights to the 6.4–acre parcel of the University property. On October 28, 1992, the University, and Marlborough as contract purchaser, deeded this 6.4–acre parcel to the County to complete the transaction.

## B.

■ The government contends that Colton and Laskin committed bank fraud by engaging in a scheme to defraud Second National "of the full value of its security interest in the land that it released from its deed of trust" by fraudulently concealing the $2.1 million payment Colton and Laskin received from the County. Brief of Appellee at 19. Colton maintains that he made no affirmative misrepresentations to Second National and had no duty to disclose any of the details surrounding the transfer of property to the County.[8] He contends that Second National "agreed to substitute security on its loan agreement because the proposed substitution was a very good deal for the bank," and the fact that Second National was prevented "from playing a bargaining chip in these negotiations" does not constitute bank fraud. Brief of Appellant at 46.

---

8. Laskin testified that the alleged scheme included "telling" Second National that a portion of the University tract was to be "dedicated" to the County. But another government witness, a Second National loan officer, testified that no affirmative misrepresentation or misleading statements were made to the bank. Colton asserts that after this testimony the government conceded in the trial court that he made no affirmative misrepresentations with respect to the Second National transaction. Although we are not directed to any record support for this asserted concession, for purposes of this discussion, we assume the government did so concede. We note that although the record contains correspondence regarding the need to dedicate land to the County for public roadway development, the land referred to in those documents is located *within* the 135–acre Riverside tract and does not relate to any portion of the University tract. The "saving and excepting" clause of the Modification and Forbearance Agreement quoted in text above likely refers to these grants within the Riverside tract.

■ Thus, once again Colton's principal claim is that absent evidence of affirmative misrepresentations or a disclosure duty, he cannot be found to have "knowingly execute[d], or attempt[ed] to execute, a scheme or artifice ... to defraud a financial institution," in violation of 18 U.S.C. § 1344. For the reasons set forth above, we reject this argument. The government need not offer evidence of misrepresentations or a disclosure duty to prove a violation of § 1344. Rather, a scheme to deceive a financial institution can be proven by evidence of active concealment of material information from the financial institution. The government certainly offered such evidence with respect to the Second National transaction. A jury could reasonably find that Colton and Laskin obtained a $20 million loan from Second National to purchase the Riverside property and secured that loan by a deed of trust in which they agreed to provide Second National a percentage of the "net proceeds" realized from the sale of each parcel of the Riverside property. A jury could further find that after Colton and Laskin had defaulted on the $20 million loan, they arranged a land swap of 13.2 acres of the Riverside property for part of the University tract, and concealed from Second National the fact that a portion of the acreage received in that swap would be deeded to the County in exchange for the payment of $2.1 million to Colton and Laskin. A jury could thus conclude that Colton and Laskin knowingly executed a scheme to defraud Second National by actively concealing from the bank the extent of the "net proceeds," namely the $2.1 million payment.

■ We recognize that to prove bank fraud, another essential element of the crime must be satisfied: such a scheme or artifice must be one designed to deprive a financial institution of *a property interest.* *See McNally,* 483 U.S. at 358,

107 S.Ct. 2875 (quoting *Hammerschmidt,* 265 U.S. at 188, 44 S.Ct. 511, to hold that "the words 'to defraud' [in the mail fraud statute] commonly refer 'to wronging one in his property rights by dishonest methods or schemes'"); *see also Carpenter v. United States,* 484 U.S. 19, 25, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (clarifying that *"McNally* did not limit the scope of [the mail fraud statute] to tangible as distinguished from intangible property rights").[9] Colton contends that Second National "did *not* have any financial interest in the University of Maryland property," and explains that "the property ceded to the County was *not* Riverside property in which Second National bank had any legal interest; it belonged exclusively to the University of Maryland, which transferred it directly to the County." Brief of Appellant at 44 & n. 17.

What Colton fails to acknowledge is that the "property ceded to the County" had been swapped for the Riverside property, in which the bank *did* have a security interest. Indisputably, the 6.4 acres of University property eventually conveyed to the County was a part of the University tract that was swapped for the 13.2–acre parcel of Riverside property. *Compare* Gov. Ex. 92, Exhibit B (description of property) *with* Exhibit A to Gov. Exs. 106–07, 110–111 (description of properties) (Four deeds transferring land from University to effectuate the land exchange agreement). *See* Tr. Trans. at 1071 (Oct. 21, 1998) (testimony of Susan Beth Dubin, Esq., counsel for University of Maryland in the land swap) (stating that the 6.4–acre parcel conveyed to the County was "part of the University's property that we were exchanging for the Riverside property"); *id.* at 1072–78 (discussing the land exchange agreement). Because the University's 6.4–acre tract was in fact conveyed in exchange for the Riverside property (albeit the conveyance was to the County, not

---

9. As mentioned in Part I, Congress expanded the scope of the federal fraud statutes in response to *McNally* in order to protect against the deprivation not only of property rights but of "the intangible right of honest services" as well, *see* 18 U.S.C. § 1346, a right not implicated in the instant case.

to Marlborough), the bank was entitled by operation of the Loan Agreement to a percentage of the "proceeds" from the $2.1 million sale of those 6.4 acres.[10]

 True, Second National's property interest in the "proceeds" from its secured property was not as direct as the RTC's interest in its $3.1 million loan. But, like the term "defraud," the scope of property interests protected by the bank fraud statute is defined broadly. *See, e.g., United States v. Mancuso,* 42 F.3d 836, 845 (4th Cir.1994) (citing *McNally,* 483 U.S. at 356, 107 S.Ct. 2875). The first clause of the statute "allows conviction for a defrauding of *any* property interest." *Id.* (finding a property interest in an assignment of rights giving a financial institution a security interest in the proceeds of certain contracts). Moreover, the "scheme to defraud" clause of the bank fraud statute requires only that a financial institution be exposed to "an actual or potential risk of loss." *United States v. Wilkinson,* 137 F.3d 214, 232 (4th Cir.1998) (citing *United States v. Jacobs,* 117 F.3d 82, 93 (2d Cir.1997)). Colton and Laskin's scheme to defraud and actively conceal material information from Second National certainly caused the bank a "risk of loss" of a genuine "property interest."

### III.

Colton maintains that even if we should conclude, as we have, that the government produced sufficient evidence to support his conspiracy and substantive bank fraud convictions, the latter should nonetheless be reversed and remanded for a new trial. He contends that the four bank fraud counts, Counts II through V, charge separate acts in furtherance of a single overall scheme—defrauding Second National by arranging the land swap without disclosing the $2.1 million payment. In other words, Colton maintains that the substantive bank fraud counts are multiplicious and argues that this multiplicity requires reversal of all four counts.

Multiplicity involves "charging a single offense in more than one count in an indictment." *Mancuso,* 42 F.3d at 847 n. 11 (internal quotation marks omitted). The multiplicity doctrine finds its roots in the Fifth Amendment's Due Process Clause, which "assure[es] that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." *Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977). Building on this principle, Colton maintains that "simultaneous trial" on the assertedly multiplicious "Counts II–V violated" his "due process and double jeopardy rights" and so requires reversal of those counts and remand for a new trial. Brief of Appellant at 49.

 Section 1344 authorizes prosecution for each *execution* of a scheme to

10. Colton notes that a Second National loan officer testified at trial that "[t]he release provision was really designed for a true cash sale.... It wasn't made with the intent of a land swap." This may be so, but the parties clearly treated the release provision as applying to land swaps as is demonstrated not only by trial testimony, but also by the Modification and Forbearance Agreement. Furthermore, not even Colton contends that "proceeds" are confined to cash proceeds, perhaps because the Supreme Court long ago rejected such a theory. *See Phelps v. Harris,* 101 U.S. 370, 380 (1879) (holding land received from disposition of real estate falls within the definition of proceeds noting "[p]roceeds are not necessarily money"). We recognize that after full and proper disclosure the bank might have agreed that Col-ton and Laskin's willingness to release their contractual rights and complete certain road improvements on the 6.4 acres conveyed to the County merited some extra compensation to them. But Colton does not suggest, and nothing in the record indicates, that Second National agreed that $2.1 million was appropriate extra compensation for Colton and Laskin or that the bank was willing to forego *any* claim to these "proceeds" from the Riverside property. The fact that Second National concluded that receipt of the 8.8–acre tract of University property in exchange for the 13.2 acres of Riverside property would constitute in Colton's words a "very good deal," certainly does not constitute such evidence; it only demonstrates that the bank underestimated the value of the 13.2–acre Riverside tract.

defraud a financial institution, *not* each act in furtherance of such a scheme. *See, e.g., United States v. Longfellow,* 43 F.3d 318, 322–25 (7th Cir.1994); *United States v. Molinaro,* 11 F.3d 853, 859–60 (9th Cir. 1993); *United States v. Lilly,* 983 F.2d 300, 303–04 (1st Cir.1992); *see also United States v. Lemons,* 941 F.2d 309, 318 (5th Cir.1991). A single scheme can, however, "be executed a number of times." *Longfellow,* 43 F.3d at 323 (citing *United States v. Hord,* 6 F.3d 276, 282 (5th Cir.1993); *United States v. Hammen,* 977 F.2d 379, 382–83 (7th Cir.1992); *Lemons,* 941 F.2d at 318.) Here, the government charged Colton with four acts in furtherance of the same scheme, namely the scheme to defraud Second National outlined above. Count II charged that Colton executed the scheme by entering into the agreement with the County whereby it paid him and Laskin $2.1 million for "approximately six acres of land"; Count III charged that Colton executed this scheme by representing to the bank that a parcel of property would be conveyed to the County without compensation; Count IV charged that Colton executed the scheme by causing the relevant deeds to be recorded; and Count V charged that Colton executed the scheme by causing the bank to "execute a Modification and Forbearance Agreement in which Second National released its lien on certain property."

■ Before beginning our multiplicity analysis, we note that although Colton maintains that all four of these counts are multiplicious, only two—Counts III and V—are actually at issue. The jury acquitted Colton on Count IV. In addition, Colton moved to dismiss Counts III through V as multiplicious, but failed to move to dismiss Count II. Failure to object to a count on grounds of multiplicity prior to trial generally waives that objection. *See* Fed.R.Crim.P. 12(f). Relief from the waiver of an objection is appropriate only if the moving party demonstrates cause for the failure to object and actual prejudice resulting from the defect.

*See Wainwright v. Sykes,* 433 U.S. 72, 84, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Colton has failed to make such a showing here and thus has waived a multiplicity claim with regard to Count II.

■ Turning then to the question of whether Counts III and V are multiplicious, we must determine whether each count charges a separate execution of a scheme to defraud or instead simply alleges an act in furtherance of the scheme. This can present a daunting task. Some principles, however, guide our analysis.

■ When an act is "chronologically and substantively independent" from the other acts charged as the scheme, it constitutes an execution. *United States v. Harris,* 79 F.3d 223, 232 (2d Cir.1996); *United States v. Wall,* 37 F.3d 1443, 1447 (10th Cir.1994); *Molinaro,* 11 F.3d at 860; *United States v. Allender,* 62 F.3d 909, 912 (7th Cir.1995) ("[C]ourts have consistently held that a separate execution must be chronologically and substantively independent."). For this reason, courts have found each in a series of "separate diversions of funds," *Mancuso,* 42 F.3d at 847, separate loans, *Allender,* 62 F.3d at 913, and separate extensions of a loan agreement, *Harris,* 79 F.3d at 232, to be a separate execution of a bank fraud scheme properly chargeable in a separate count of the indictment, even though each was a part of a single scheme to defraud a single financial institution.

■ In contrast, evidence that acts are "planned or contemplated together" may indicate that they are dependent on one another and cannot be separately charged. *Allender,* 62 F.3d at 913; *see Longfellow,* 43 F.3d at 325. Thus, a series of transactions to procure $212,000 from a financial institution was held to be "part of but one performance, one completion," and, therefore, "one execution," thereby making separate counts multiplicious. *Lemons,* 941 F.2d at 318. Similarly, although a scheme to defraud involved two loans, it was held only to have resulted in a single execution

because the two loans "were integrally related; one could not have succeeded without the other"; hence, the indictment charging procurement of each loan as a separate execution was found to be multiplicious. *United States v. Heath,* 970 F.2d 1397, 1402 (5th Cir.1992).

In the case at hand, it is clear that acts charged in the indictment as separate executions of the Second National scheme were indeed "planned or contemplated" together. *Allender,* 62 F.3d at 913. Each part of this scheme was carefully crafted and performed in a particular sequence in order to divert a single payment to Colton and Laskin. Each of the charged "executions" was in fact part of but "one performance, one completion, one execution." *Lemons,* 941 F.2d at 318. Unquestionably, all of the charged "executions" were "integrally related." *Heath,* 970 F.2d at 1402. Indeed, without Colton and Laskin's agreement to transfer the 6.4–acre tract to the County for $2.1 million (Count II), neither the act charged as an execution in Count III (misrepresentation that the parcel would be conveyed to the County without compensation) nor that charged as an execution in Count V (causing the bank to execute the release) would have violated § 1344. Accordingly, we believe it clear that Counts III and V are, as Colton maintains, multiplicious.

■■■ This does not mean, however, that the multiplicious indictment placed Colton in double jeopardy, thereby requiring a new trial on the Second National transaction. Assuming that Colton's pretrial motion to dismiss Counts III–V on multiplicity grounds preserved his appellate, multiplicity-based double jeopardy argument, *cf. United States v. Jarvis,* 7 F.3d 404, 409 (4th Cir.1993), the argument is nonetheless meritless. First, the principal danger created by multiplicity is that a defendant will receive multiple punishments for a single offense. *See* 1A

Charles Alan Wright, Federal Practice and Procedure § 145, at 87, (3d ed.1999). That has not occurred here. Pursuant to the Sentencing Guidelines, Colton was given concurrent sentences for the three Second National counts of which he was convicted. *See* U.S.S.G. § 5G1.1(c). The only "additional punishment" he received was two additional special assessments, which we can easily remedy by remanding this case to the district court with instructions to vacate the convictions on Counts III and V and resentence accordingly. *See Ball v. United States,* 470 U.S. 856, 864–65, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985).

■■■ Colton concedes that this is the usual remedy but nonetheless maintains that he was possibly prejudiced because the jury was given "four distinct chances to vote for conviction on what should have been a single offense." Brief of Appellant at 58; *cf. United States v. Dunford,* 148 F.3d 385, 390 n. 1 (4th Cir.1998). We perceive no prejudice because exactly the same evidence was offered to prove all four counts. Thus, the jury would have learned of the same evidence even if only a single charge had been brought. *See United States v. Clark,* 184 F.3d 858, 872 (D.C.Cir.1999). Indeed, Count II sets forth the scheme to defraud Second National in twenty-two separate paragraphs, all of which were re-alleged by reference in Counts III, IV, and V; the counts differed only in what part of the scheme was charged as an execution.[11]

Accordingly, we affirm Colton's conviction under Count II and remand his convictions under Counts III and IV with instructions to vacate them and resentence accordingly.

## IV.

■■■ Finally, we address the government's cross-appeal with respect to the

---

11. Nor, contrary to Colton's suggestion, does the fact that the multiple counts here allege violations under the same, rather than differ-

ent, statutes require a different result. *See, e.g., United States v. Langford,* 946 F.2d 798 (11th Cir.1991).

Second National transaction. The government maintains that the district court erred in refusing to enhance Colton's sentence by four levels pursuant to U.S.S.G. § 2F1.1(b)(6)(B) (now renumbered as U.S.S.G. § 2F1.1(b)(7)(B)), which provides for an enhancement if "the defendant derived more than $1,000,000 in gross receipts from the offense." When considering a district court's application of the Sentencing Guidelines, we review factual findings for clear error and legal interpretations *de novo*. *See United States v. Blake,* 81 F.3d 498, 503 (4th Cir.1996).

The record indicates, and the parties acknowledge, that Prince George's County made out a check payable to "Marlboro [sic] Colton Laskin" in the amount of $2,052,000, which was then deposited into Marlborough's corporate account. From these funds, Colton and Laskin each received $300,000 individually; the remainder was used to satisfy corporate obligations of Marlborough and Colton and Laskin's other business ventures. Because only $300,000 was "kicked out" to Colton, and because the rest of the proceeds went to Laskin or Marlborough, an "independent entity," the district judge found that Colton did not "derive more than $1,000,000 in gross receipts." As a result, the district court refused to apply the enhancement.

The government asserts that this constituted clear error, because Colton owned fifty percent of Marlborough and, thus, "indirectly" received half of the more than $2,000,000 from the fraud. An application note to the guideline explains that: " 'Gross receipts from the offense' includes all property, real or personal or, tangible or intangible, which is obtained *directly or indirectly* as a result of such offense." U.S.S.G. § 2F1.1, comment. (n.18) (emphasis added). The government relies on several cases interpreting the guideline and application note in which a defendant received the enhancement even though the

proceeds of a bank fraud went directly to corporate entities and not to the individual defendants. *See, e.g., United States v. Stolee,* 172 F.3d 630, 631 (8th Cir.1999); *United States v. Bennett,* 161 F.3d 171, 193 (3d Cir.1998); *United States v. Kohli,* 110 F.3d 1475, 1477–78 (9th Cir.1997); *United States v. Maack,* 59 F.Supp.2d 448, 450 (E.D.Pa.1999).

The government's reliance on these decisions, however, is unavailing. Unlike the instant case, each of the above decisions involved a defendant that had a controlling stake in—if not complete ownership of—the companies receiving the illegally obtained funds. *See, e.g., Stolee,* 172 F.3d at 631 (affirming enhancement because, as the sole owner and president of the company, the defendant "arranged for the funds to be deposited into an account he controlled, and he directed how the funds were used" and therefore "indirectly benefitted from the illegally derived funds"); *Bennett,* 161 F.3d at 193 (affirming enhancement because defendant "possessed a 100 percent interest" in the company); *Kohli,* 110 F.3d at 1477–78 (finding proceeds in excess of $1,000,000 were distributed directly to the defendant or to an entity controlled by him); *Maack,* 59 F.Supp.2d at 450 (applying enhancement because "[a]s there are no other participants, no one besides [defendant] can be attributed with the money," and defendant was president of the company in which he owned a controlling seventy-five percent interest). Thus, those defendants controlled how, and for whom, the money was used. Such control, the courts found, allowed the defendants to indirectly benefit from the illegal proceeds.

In contrast, Colton owned only a fifty percent—i.e., noncontrolling—interest in Marlborough. Colton's fifty percent stake in Marlborough did not give him "control" of, or rights to, fifty percent of the proceeds from the Prince George's County transaction.[12] A contrary reading would

---

12. Even if Colton ordinarily shared fifty per- cent of Marlborough's "profits," the record

conflict with black-letter corporate law. *See* 1 *Fletcher Cyclopedia of Private Corporations* § 31 (rev. ed. 1995)("The property of the corporation is *its* property, and not that of the shareholders.... [W]hich do not carry the capital property or any profits until they have been declared and vested as dividends.") (emphasis added). Colton could not unilaterally use the funds for his individual purposes, and nothing in the record indicates that he individually benefitted by more than the $300,000 "kicked out" to him.

The government failed to demonstrate that Colton "derived more than $1,000,000 in gross receipts from the offense." Accordingly, we affirm the district court's refusal to apply the § 2F1.1(b)(6)(B) enhancement.

### V.

To summarize, with respect to Colton's appeal, we affirm his convictions under Counts I and II; we remand the case so that the district court can vacate his convictions under Counts III and V and resentence. With respect to the government's cross-appeal, we affirm the district court's refusal to enhance under § 2F1.1(b)(6)(B).

No. 99–4142—*AFFIRMED IN PART AND REMANDED IN PART* No. 99–4185—*AFFIRMED*

does not indicate that more than $2,000,000 of the Prince George's payment constituted "profits." Indeed, the record shows that most of that money was used to pay corporate obligations, and thus were not profits in any sense of the word.