**GNAGEY GAS & OIL CO., INC., Petitioner**

v.

**PENNSYLVANIA UNDERGROUND STORAGE TANK INDEMNIFICATION FUND and Pennsylvania Underground Storage Tank Indemnification Board, Respondents.**

Commonwealth Court of Pennsylvania.

Argued April 15, 2013.

Decided Dec. 6, 2013.

Reconsideration and Reargument Denied Jan. 23, 2014.

Robert J. Ridge, Pittsburgh, for petitioner.

Amy L. Weber, Harrisburg, for respondent.

BEFORE: McGINLEY, Judge, McCULLOUGH, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge McCULLOUGH.

Gnagey Gas & Oil Co., Inc. (Gnagey) petitions for review of the June 21, 2012 adjudication and order of the Underground Storage Tank Indemnification Board (Board), which adopted the report and recommendation of the Presiding Officer of the Underground Storage Tank Indemnification Fund (Fund) and dismissed Gnagey's exceptions to the report. The Board upheld the Presiding Officer's conclusion that Gnagey engaged in fraudulent conduct in concealing material information and in failing to cooperate with the Fund during the removal of underground storage tanks (USTs) on contaminated property owned by Gnagey. Accordingly, the Board concluded that under the Storage Tank and Spill Prevention Act of 1989 (the

Tank Act)[1] and applicable regulations, the Fund is entitled to recoup $319,738.57 it paid to Gnagey for remediation expenses.

This case involves the Fund's determination that Gnagey was eligible for funds for remediation measures made in connection with the removal of four USTs from Gnagey's property and the Fund's later decision to revoke Gnagey's eligibility and recoup the funds paid on the grounds that Gnagey fraudulently concealed the existence of eight unregistered and abandoned/orphaned tanks during the clean-up.

## I. Facts and Procedural History

The relevant facts and procedural history of this case, as found and detailed in a commendable fashion by the Presiding Officer, are as follows:

Gnagey purchased the Cranberry Township site of the subject claim in 1995 from Gulf Oil.... When Gnagey purchased the property, five [USTs] were registered for the site. The four registered gasoline tanks were located in one tankfield on the southern edge of the property while the location of a 500 gallon registered waste oil tank was unknown.

In addition to the registered tanks, **the site contained eight additional abandoned and unregistered USTs.** Four of the unregistered tanks were just southwest of the dispenser islands near the center of the property, and the other four were north of the dispensers. The tanks were of the type used in the 1950s and 1960s, and all had been taken out of service sometime before 1970.

In connection with Gnagey's purchase of the property, a site assessment was performed in 1995 to identify potential contamination on the site. Twenty-four borings were drilled on the site, mostly around the perimeter of the property. Three of the borings revealed contamination in excess of the state regulatory standards in effect at that time. One of the borings containing contamination was between the dispenser islands and the registered tanks where the drill hit a product line. The other two borings showing contamination were near the northernmost unregistered tanks. The environmental contractor dug out the area around the boring which struck a product line, removed a small amount of soil, made a repair to the line and backfilled everything. The area around the other two contaminated borings was not addressed, and the sale to Gnagey was completed.

After purchasing the property from Gulf Oil, Gnagey operated the site as a convenience store and service station until 2007, when Gnagey was in the process of selling the site to a land developer. As part of that sale, a site assessment was conducted for the buyer and the assessment indicated contamination. Because the sale was contingent on the site being free of contamination, Gnagey engaged United Environmental Group ("UEG"), a firm which performed Gnagey's environmental work for many years.... In August 2007, UEG on behalf of Gnagey timely reported the release to the Pennsylvania Department of Environmental Protection ("DEP") and to [the Fund]. At that time, the source of the contamination was listed as being unknown. [The Fund] engaged ICF International ("ICF") to investigate and administer the claim, and the claim was assigned to Ron Moore. After an initial investigation, [the Fund] through Mr. Moore granted eligibility for the claim on November 1, 2007, with the letter indicating that **any corrective action costs**

---

1. Act of July 6, 1989, P.L. 169, *as amended,* 35   P.S. §§ 6021.101–6021.2104.

attributable to contamination found to have been released prior to February 1, 1994 would not be covered by the Fund.

Mr. Moore was notified that the tanks were going to be removed in March 2008. . . . On March 3, 2008, UEG began excavation, starting on the southern side of the property where the registered tanks were located.

Upon removing the four tanks, UEG encountered contamination in the tank pit and began removing the contaminated soil and water. One of the tanks was cracked, and UEG determined it to be the source of the release even though the tank system had passed tightness testing as recently as 2007. After removing the tanks and excavating soil in the tank pit, UEG began excavating along the product line towards the dispenser islands as that trench also was contaminated. On March 17, 2008, UEG issued an invoice which was paid by the Fund.

UEG initially stockpiled the contaminated soil on the northern side of the property but eventually ran out of room and began hauling the contaminated soil away to an incineration facility. Given the volume of contaminated soil which was being excavated, the Ohio facility was less costly than a Pennsylvania landfill which requires analytic sampling on every hundred tons of soil. **As a result, the excavated soil was not available for analysis and samples were not taken or preserved for analysis.**

UEG continued to excavate towards the north of the property, ultimately encountering and removing the abandoned unregistered tanks between March 18 and 28, 2008. **The abandoned tanks were riddled with holes and were filled with water. UEG removed the** contaminated water from the tanks and disposed of it off site. Soil was visibly contaminated under and around the abandoned tanks. Gnagey was notified when UEG encountered the first set of abandoned tanks in the center of the property and again when UEG encountered the second set in the northern portion of the property. Gnagey was informed that there was contamination around the abandoned tanks.

**In March and April 2008, UEG invoiced Gnagey rather than [the Fund] for removal of the abandoned tanks and disposal of contaminated water in the tanks. With those invoices, UEG supplied Gnagey with photographs of the abandoned tanks in the ground and after removal. The photographs showed the obvious contamination of the soil under and in the vicinity of the abandoned tanks.**

On March 19, 2008, **after the first set of abandoned tanks was discovered, Mr. Klesic of UEG telephoned Mr. Moore and informed him that the product line ditches were filtering product into an old pit or former foundation but did not mention the abandoned tanks in the pit.** On March 26, 2008, **in response to a request for status** by Mr. Moore, **UEG advised Mr. Moore that 4,000 tons of impacted soil had been removed** from the site and that **no other remedial activity** had occurred other than removal of ponded water. Again, **the abandoned tanks and surrounding contamination were not mentioned.**

UEG issued invoices on March 28, April 7 and April 15. . . . The March 28 invoice was accompanied by a narrative and a site map showing the general areas of excavation. The area containing the first set of abandoned tanks encountered was designated as a former excavation

with fill material which "could have been [the] former basement of [the] previous station." The area mostly containing the second set of abandoned tanks was described as "what may have been old leach bed." Only the registered tanks were shown on the site map and the daily narrative did not mention encountering and removing the abandoned tanks. Unlike the invoices and supporting narrative prior to discovery of the unregistered tanks, the subsequent invoices and supporting narrative do not indicate work performed which was billed to Gnagey [e.g., removal of the abandoned tanks and disposal of contaminated water in the tanks.]

The April 7 invoice was accompanied by a photo-documentary and narrative of the 37 photographs. There were no unregistered tanks described in the narrative or depicted in the photographs. [The Fund] requested additional information from Gnagey. UEG informed Mr. Moore on April 30, 2008 that the excavated area had been backfilled. Because the site had been backfilled and over 6,000 tons of soil had been excavated without backup information, the Fund in early May 2008 authorized a third party reviewer to examine the remedial action at the site, including whether it was reasonable, necessary and appropriate.

Also in May 2008, Gnagey and UEG submitted the tank closure report to DEP. The report did not mention the abandoned tanks. The site map showing the limits of excavation depicted only the registered tanks. The photographs submitted showed the areas where the abandoned tanks had been removed but do not show the abandoned tanks. When DEP's professional geologist from the environmental cleanup section visited the site in May of 2008, all of the tanks had been removed and the site was backfilled.

Gnagey and UEG were pressing [the Fund] for payment of three outstanding invoices, but the Fund indicated that it was having a hard time approving payment for 6,000 tons of soil without explanation and on the basis of one soil sample. UEG supplied Mr. Moore with a June 6, 2008 chronology of the daily work activities at the site from March 3, 2008 through April 3, 2008. Although the chronology contained detail concerning observations, field testing and excavation of contaminated soil performed on each day, it did not disclose the discovery of the eight abandoned tanks and associated contamination.

Mr. Moore continued to request additional information from Gnagey about past contamination and the fifth registered tank which had not been accounted for. On July 1, 2008, the third party reviewer (Dennis Breakwell, P.G.) and a colleague met with Mr. Gnagey and UEG's owner (Stephen Klesic) and environmental manager (Michael McIntyre, P.G.). During the two-hour meeting, Mr. Breakwell was given the 1995 site assessment report, additional photographs and a site map showing the limits of excavation. UEG's contaminate transport model, how one tank in a corner of the site could impact the entire site, did not make sense to Mr. Breakwell. Breakwell asked about the "old tank field" area designated on the 1995 site map and which contained four of the abandoned tanks, and was informed that Gnagey and its consultant had no idea of the number of tanks, whether they had leaked, what they had contained, or when they were removed. UEG described the other four abandoned tanks as possibly be-

ing an old foundation or old UST cavity, but did not mention the four abandoned tanks encountered in that area.

The conceptual contamination model presented to Mr. Breakwell was that contamination came from the one registered tank in the southwest corner of the property and migrated during periods of high shallow groundwater through the product piping trench to the center of the site and from there to the east and north through old fill material. Following the meeting, Mr. Breakwell summarized the meeting for Mr. Moore and [the Fund] and his conclusions that the site was heavily contaminated and that the conceptual model was feasible.

The Fund did not have enough information to deny payment of the invoices nor enough information to approve full payment. The Fund also determined that because the site had been backfilled and there were no other sources of evidence, it would offer to pay 70 percent of the soil removal invoices. The Fund made the offer to Gnagey through his attorney verbally on July 7, 2008 and in writing on July 11, 2008 to pay 70 percent of the soil removal invoices, or $319,738.57. The written offer was in the form of a Fund determination including the right to appeal the determination by August 15, 2008. On August 13, 2008, Gnagey's attorney accepted the proration of the three invoices and [the Fund] paid the reduced amount.

Gnagey and UEG submitted the Site Characterization Report and Remedial Action Plan to DEP in late September or early October 2008. Neither document described nor depicted the eight abandoned tanks.... Both documents were supplied to the Fund in early October 2008.

Mr. Moore still had questions about the fifth registered tank which [remained] unaccounted-for. [Gnagey] replied that [it] had no information "related to the location and date of the former 5th on-site UST or Tank 005. During Gnagey's Interim Remediation activities, UEG did not encounter any 550 gallon Waste Oil Tank, nor did [it] encounter any other regulated storage tank, other than the four tanks that were indicated in Gnagey's closure report." However, the documentation which had been supplied to Mr. Moore contained a handwritten field note for March 28, 2008 referencing the "last UST found yesterday." Mr. Moore asked Gnagey's attorney about the field note and requested information about its location, condition, evidence of surrounding contamination as well as whether [Gnagey] was aware of the orphan tank.

The response to Mr. Moore was that on March 27, 2008, UEG found an unregulated, intact 6,000 gallon orphan UST under the kiosk/fuel islands with significant contamination in the vicinity which was reported to DEP. The reply stated that Gnagey was unaware of the tank when purchasing the property and during its ownership of the property until Gnagey became aware of the tank when it was discovered on March 27, 2008. The reply did not mention the other seven unregistered tanks which had been discovered during the excavation. The reply also pressed for payment of outstanding invoices not covered by the compromise payment or an explanation why they were not being paid. In November and December 2008, Mr. Moore requested of Gnagey's attorney additional information about the orphan tank and indicated that such information was crucial in resolving the outstanding invoices. UEG final-

ly supplied to Gnagey's attorney a site map depicting the eight abandoned tanks and the photographs of their removal which had been withheld from [the Fund]. The attorney met with Mr. Moore on February 27, 2009 and showed him the site map and 59 photographs. This was the first time the [Fund] or its agents learned of the abandoned tanks.

Mr. Moore took Mr. Gnagey's statement under oath on March 27, 2009, and Mr. Gnagey acknowledged knowing about the eight abandoned tanks. Mr. Gnagey also acknowledged that he was informed by UEG that there was contamination around the abandoned tanks, something which was his obligation to pay for. However, UEG never billed Gnagey for any soil removal, instead seeking payment from the Fund. Because of this new information, the Fund on September 2, 2009 denied Gnagey's request for further payments related to corrective action at the site and denied eligibility for the claim because of a failure to cooperate and material misrepresentations to the Fund. Gnagey appealed that determination, but the appeal was held in abeyance at Gnagey's request.

Ultimately, on September 22, 2010, the Fund affirmed the September 2, 2009 denial and reserved the right to seek reimbursement for payments made which were subsequently deemed to have been ineligible. Gnagey did not further appeal that determination. On November 16, 2010, the Fund's Executive Director sent a demand letter to Gnagey for repayment of $394,948.56 for reimbursement of ineligible claim payments, which is the determination at issue. . . .

(Presiding Officer's Recommendation at 36–44) (emphasis added).

By report and recommendation dated January 31, 2012, the Presiding Officer found that the Fund presented clear and convincing evidence that Gnagey perpetrated a fraud in concealing the existence of the abandoned tanks and/or misrepresenting the number of tanks at the site. (Presiding Officer's Recommendation at 46–52.) In so doing, the Presiding Officer, based upon his credibility determinations, found that Gnagey did not have knowledge of the abandoned tanks prior to March 18, 2008:

> Mr. Klesic's testimony, the statements by Mr. Gnagey, and their submissions to the Fund indicating lack of knowledge of the abandoned tanks or associated contamination until discovered in March 2008 is credible. Gnagey did not purchase the property until 1995, long after the tanks were taken out of service. The environmental assessment performed at that time indicated minimal contamination, with the greatest contamination occurring where a soil boring struck an active product line. The site map in connection with that assessment designated one of the old tank fields, but did not show any tanks other than four registered gasoline tanks. Mr. Gnagey and his contractor had no reason to know of the eight abandoned tanks. Also credible is the existence of a crack in one of the registered tanks which could lead Gnagey and UEG to believe initially that contamination encountered in early March 2008 was from the registered tank. There was no misrepresentation or deceitful nondisclosure prior to approximately March 18, 2008 when UEG encountered the first set of abandoned tanks surrounded by extensive contamination.

(Presiding Officer's Recommendation at 47.)

However, the Presiding Officer rejected as not credible Gnagey's argument and evidence that Gnagey did not attempt to deceive the Fund after it became aware of the abandoned tanks:

> Not credible is Gnagey's explanation why the abandoned tanks and surrounding contamination were concealed from the Fund. Nor is it credible that Gnagey and UEG believed that no contamination came from the old abandoned tanks. Mr. Gnagey himself acknowledged that Mr. Klesic told him of contamination around the old tanks not covered by the Fund, although removal of that contaminated soil was billed to the Fund. By Mr. Klesic's admission, the old tanks were riddled with holes and surrounded by substantial contamination. Both Gnagey and UEG knew that contaminated water was in the tanks. The pictures taken by UEG and supplied to Gnagey clearly showed the contamination on and surrounding the [abandoned] tanks, including the soil directly underneath [the] tanks. n.3

---

n.3. **Mr. Klesic's explanation why the contamination around the abandoned tanks did not come from those tanks defies credulity, and actually corroborates that the abandoned tanks were the source.** Explaining that the tanks were "riddled with holes, and water was leaking out of them," Mr. Klesic states that petroleum product would have found the surface of the water because it floats. [N.T. at 437]. He then testified that because the contamination around the tanks was in the soil below the water table it must have come from something else. [N.T. at 438]. This contradicts UEG's asserted contamination transport model in which the product from the registered tank supposedly floated on water through fill material throughout the site. Mr. Klesic did not explain how

under that theory, heavy contamination could end its way to the soil directly underneath the abandoned tanks.

---

(Presiding Officer's Recommendation at 47–48.)

Based on the evidence presented, the Presiding Officer instead determined that Gnagey engaged in knowing concealment of material information:

> [T]he actions of UEG and Gnagey **demonstrate a knowing concealment calculated to induce the Fund to pay for cleanup of a release which was not** ... **eligible.** The photographs were supplied to Gnagey but not to [the Fund]. Although the soil removal was billed to [the Fund], the tank removal and at least a substantial portion of the contaminated water disposal was billed to Gnagey, [and] invoicing [the Fund] for these activities would have tipped off the Fund of the existence of the abandoned tanks. Further, **unlike the invoices submitted to the Fund prior to discovery of the abandoned tanks, the details supplied to the Fund failed to indicate work which was being billed to Gnagey.** This shift in invoicing procedure evidences a conscious concealment of the activities surrounding the abandoned tanks.

> In addition, **very selective information was given to DEP and the Fund** in the months following discovery of the old tanks and associated contamination. The information included daily narrative, photographs, field test results, observations, and work performed each day except anything to do with the abandoned tanks. **Answers to questions and documents supplied to [the Fund] and DEP failed to disclose the obviously material conditions in the two old tankfields from which massive**

amounts of soil were removed and taken away for incineration and disposal. If any analytic soil samples were taken from the contaminated soil beyond the registered tank area, analytic results were **never supplied to [the Fund] which caused the Fund to question the reasonableness** of the large excavation and **request additional information. None of the responses** for additional information **revealed the existence of the eight abandoned tanks except,** probably **accidently, the handwritten field note** for March 28, 2008 referencing "last tank found yesterday." Other than that obscure reference to one of the abandoned tanks, all of the photographs, narratives, explanations, answers and supporting documentation were sanitized of evidence of the abandoned tanks. **When questioned directly about that field note in October 2008, [Gnagey] acknowledged only one** "intact" unregistered tank, perpetuating the concealment of the other seven. . . . [N.T. at 437].

**Further, in addition to the calculated effort to conceal the abandoned tanks, [Gnagey] and its agents affirmatively misrepresented their knowledge of the tanks.** When Mr. Breakwell questioned Gnagey and UEG representatives at the July 1, 2008 meeting about the northern "old tank field area" which appeared on the 1995 site map, he received the reply that they had no idea of the number of tanks or when the tanks were removed although UEG (with Gnagey's knowledge) **removed four tanks from the area less than four months previously.** When questioned about the area in the center of the site containing the other four abandoned tanks, [Gnagey] **replied that it maybe was an old building foundation or possibly a former UST cavity but believed it to be a building foundation.** In actuality, the represen-tatives of Gnagey and UEG knew that it was a UST cavity because they had removed the four tanks it contained.

(Presiding Officer's Recommendation at 48–50 (emphasis added) (footnotes omitted)).

Finally, the Presiding Officer rejected Gnagey's argument that its conduct evidenced a good-faith attempt to comply with the law:

> **[Gnagey's] reliance upon DEP regulations and guidance to excuse its concealment of the tanks misses the mark.** It is true that the regulations and DEP policy do not require that tanks closed in place prior to 1989 containing a *de minimis* amount of product and not a source of contamination be reported to DEP as a regulated tank subject to UST closure requirements. However, **[the Fund] is not part of DEP, and DEP's registration and closure requirements are distinct** and different from the Fund's eligibility requirements. Further, **DEP requires the disclosure of old abandoned tanks** as part of the site characterization report as part of the site history, and [Gnagey] neither designated the abandoned tanks on site maps nor disclosed them in its narrative for the [site characterization report]. In addition, **the eight abandoned tanks *did* appear to be a source of contamination.** DEP's **regulations and guidance thus might have required reporting, but even if not, they did not prevent reporting to DEP and/or the Fund.**

> Most importantly, even if **the tanks** were not considered "USTs" and were not required to be reported by DEP, they **were obviously highly material to the Fund's eligibility determination.** [Gnagey] and its contractor knew that **pre–1994 releases from tanks whether**

registered or unregistered are not eligible for Fund reimbursement. n.6

_____

n.6 [Gnagey] argues that evidence established that the entire release likely was post–1994 because the assessment done in 1995 revealed a fairly clean site and the groundwater samples taken in 2007 revealed the presence of MTBE, a relatively new additive to gasoline. However, the 1995 borings mainly were on the perimeter of the property in a clay wall, and did not test the old tankfields. Moreover, two borings closest to one of the old tankfields showed contamination readings in excess of standards applicable at the time and evidently no remediation or follow-up investigation was performed at that location. With regard to the MTBE levels in the groundwater in 2007 and thereafter, this evidence does not establish that the contamination in the soil surrounding the abandoned tanks was a newer release. **Without samples and testing of that contaminated soil, there is no record of the constituents which it might or might not have contained, including lead, MTBE or any number of compounds which would have been valuable in age-dating the product in the soil. This is another reason why concealment of the tanks was so material** to the eligibility determination, even if the contamination turned out to be 100% attributable to a post–1994 release. **[The Fund] never had a chance to make that determination without testing, accurate site characterization or preservation of the material evidence.**

_____

**Concealing the existence of the tanks** as the soil was being removed for incineration and the site backfilled **deprived [the Fund] of the opportunity to evaluate** ongoing eligibility for the claim.

**This likely is why [Gnagey] concealed the existence of the tanks and associated contamination, supplied sanitized information to the Fund, and affirmatively misrepresented its knowledge of the tanks.**

Mr. Miceli of the Fund explained the effect of the concealment:

Q. Did you have any other sources of information available to you?

A. No. There was nowhere else to go. The site had been filled in, any evidence, one way or the other, had been spoiled when they backfilled the site. DEP couldn't help me. They kept giving extensions on the site characterization report. And then, ... DEP ... wasn't out at the site.

Q. Could you explain why you thought you were justified in relying upon the information that was presented to you by [Gnagey?]

A. Well, **it's a situation where if you're going to deal with consultants and with tank owners, so much of the work in and of itself is actually underground; you can't see a lot of it. We, meaning the Fund, do not want to hold up remediation until we get someone at the site. We don't have the staff to do that, so you have to trust the tank owner and the consultant and kind of deal open-handed with each other.**

[N.T. at 350–52].

No other evidence was available other than the information supplied by [Gnagey] and its agents, and the Fund had no choice but to rely upon that information.

(Presiding Officer's Recommendation at 50–51.)

Based upon these factual findings, credibility and weight determinations, and legal reasoning, the Presiding Officer concluded

that the Fund met its burden of proving that Gnagey concealed material information in order to continue eligibility for funds; that Gnagey did so with the intent to mislead the Fund; and that the Fund justifiably relied upon Gnagey's misrepresentations. (Presiding Officer's Recommendation at 52.)

■ Gnagey filed exceptions to the report and the Fund filed a reply. On June 21, 2012, the Board issued an adjudication and order dismissing Gnagey's exceptions and adopting the Presiding Officer's report in full. The Board concluded that as a result of Gnagey's fraudulent concealment and failure to cooperate with the Fund, the Fund is entitled to recoup $319,738.57 in remediation expenses that were incurred after Gnagey discovered the abandoned tanks in March 2008. Gnagey now appeals to this Court.[2]

## II. Discussion

### A. The Fund

We begin with background information and a review of the relevant statutory and regulatory provisions.

The Fund is a statutory creature in which the General Assembly requires mandatory participation by those who will benefit by it; in return for the payment of delineated tank fees, the Fund provides coverage to storage tank owners to clean up storage tank releases that pose a significant health risk to the general public. *M.H. Davis Estate Oil Co., Inc. v. Underground Storage Tank Indemnification Board*, 789 A.2d 398, 403 (Pa.Cmwlth. 2001).

The purpose of the Tank Act is to prevent the occurrence of storage tank releas-

es "through the establishment of a regulatory scheme for the storage of regulated substances in new and existing storage tanks and to provide liability for damages sustained within this Commonwealth as a result of a release and to require prompt cleanup and removal of such pollution and released regulated substance." Section 102(b) of the Tank Act, 35 P.S. § 6021.102(b). The Fund was created to provide funds to the Board "for the purpose of making payments to owners, operators and certified tank installers of underground storage tanks who incur liability for taking corrective action or for bodily injury or property damage caused by a sudden or nonsudden release from underground storage tanks and for making loans to owners as authorized by [the] [Tank Act]." Section 704(a)(1) of the Tank Act, 35 P.S. § 6021.704(a)(1).

Section 704(a)(1) of the Tank Act establishes the Fund. This provision provides:

(a) ESTABLISHMENT OF FUND.—
(1) There is hereby created a special fund in the State Treasury to be known as the Underground Storage Tank Indemnification Fund. **This fund shall consist of** the fees assessed by the board under section 705(d), **amounts recovered by the board due to fraudulent or improper claims** or as penalties for failure to pay fees when due, and funds earned by the investment and reinvestment of the moneys collected. Moneys in the fund are hereby appropriated to the board for the purpose of making payments to owners, operators and certified tank installers of underground storage tanks who incur liability for taking corrective action or for bodily injury or property damage caused by a

**2.** Our scope of review is limited to determining whether the government agency violated constitutional rights, erred as a matter of law, or whether its findings of fact are supported by substantial evidence. *Southeast Delco School District v. Underground Storage Tank Indemnification Board*, 708 A.2d 881, 882 (Pa. Cmwlth.1998).

sudden or nonsudden release from underground storage tanks and for making loans to owners as authorized by this act. The fund shall be the sole source of payments under this act, and the Commonwealth shall have no liability beyond the amount of the fund. Every owner and certified tank installer of an underground storage tank shall demonstrate financial responsibility by participating in the Underground Storage Tank Indemnification Fund....

35 P.S. § 6021.704(a)(1) (emphasis supplied).

The Board is vested with the power to create claim processing, procedural, and eligibility requirements under the Tank Act and to determine if a claimant is eligible for funds. Particularly, under section 705(b) of the Tank Act:

The [B]oard shall establish procedures by which owners, operators and certified tank installers may make claims for costs estimated or incurred in taking corrective action and for liability due to bodily injury and property damage caused by a sudden or nonsudden release from underground storage tanks. Claims determined to be eligible shall be paid upon receipt of information clearly showing that reimbursable claim costs are reasonable, necessary and directly related to the release from the storage tank that is the subject of the claim. The board, by regulation, may establish a system for prioritizing claims.

35 P.S. § 6021.705(b).

Pursuant to section 706 of the Tank Act:

In order to receive a payment from the Underground Storage Tank Indemnification Fund, a claimant shall meet the following eligibility requirements:

(1) The claimant is the owner, operator or certified tank installer of the tank which is the subject of the claim.

(2) The current fee required under section 705 has been paid.

(3) The tank has been registered in accordance with the requirements of section 503.

(4) The owner, operator or certified tank installer has obtained the appropriate permit or certification as required under sections 108, 501 and 504.

(5) The claimant demonstrates to the satisfaction of the board that the release that is the subject of the claim occurred after the date established by the board for payment of the fee required by section 705(d).

(6) Additional eligibility requirements which the board may adopt by regulation.

35 P.S. § 6021.706.

Under the Board's regulations, in order to be eligible for funds, a claimant must pay the tank fees, the UST must be properly registered, and the release of contamination must occur after February 1, 1994. 25 Pa.Code § 977.31(2)-(3). Per the regulation at 25 Pa.Code § 977.4, a "tank fee" is defined as "[t]he fee assessed upon a UST owner or operator whose tanks store regulated substances, which is calculated by multiplying the number of the USTs owned or operated by the per tank charge in [another regulation]."

When a claimant files a claim with the Fund, the claimant must, among other things, "cooperate" with the Fund. The regulation at 25 Pa.Code § 977.32 states:

§ 977.32. Participant cooperation.

(a) At a minimum, the participant shall cooperate by:

(1) **Providing all information requested by the Fund** including tank system design documents, inventory records, tank tightness test results, contracts **and other information pertinent to a claim** within 30 days of the request of

the Fund, or additional time as set by the Fund.

(2) Permitting the Fund or its agent to inspect, sample and monitor on a continuing basis the property or operation of the participant.

(3) **Providing access** to interview employees, agents, representatives or independent contractors of the participant; and **to review any documents within the possession, custody or control of the participant concerning the claim.**

(4) Submitting, and requiring employees, consultants and other interested parties subject to its control to submit, to an examination under oath upon the request of the Fund.

(5) Obtaining competitive proposals for work to be performed when requested by the Fund.

(b) **The participant shall cooperate in all respects with the Fund, its investigators, attorneys and agents during the investigation and resolution of a claim,** including the defense of a suit, as provided in § 977.35 (relating to third-party suit) and any subrogation action as provided in § 977.40 (relating to subrogation for corrective action cost).

(c) **Lack of cooperation by the participant with the Fund** or its investigators, attorneys, or agents **may result in denial of the claim or cessation of further payments on a claim.**

25 Pa.Code § 977.32 (emphasis supplied).

### B. The Fund's Authority to Demand Repayment

■ On appeal, Gnagey first argues that there is no statutory authority for the Fund to demand repayment and that the Fund's regulations only permit the Fund to deny or cease payments, not recoup payments already made. We disagree.

■ Any power exercised by an administrative agency must be conferred by statute; such powers can be expressly conferred or necessarily implied. *Department of Environmental Resources v. Butler County Mushroom Farm,* 499 Pa. 509, 514, 454 A.2d 1, 4 (1982). Pursuant to 35 P.S. § 6021.704(a), the funds in the Fund consist, among other things, of the "amounts recovered by the [B]oard due to fraudulent or improper claims." Although 35 P.S. § 6021.704(a) does not explicitly confer the Fund with the power to recoup funds procured through fraud, such a power is necessarily implied because the funds constituting the Fund are comprised, in part, of monies recouped as a result of fraudulent claims. In other words, if the Fund's corpus consists of funds recouped from fraudulent claims, and the Fund/Board is empowered to determine whether claims are eligible in the first instance, it naturally follows that the Fund/Board has the implicit authority to revoke eligibility status and recoup prior payments that the Fund/Board later discovered were obtained through fraud. If we were to adopt Gnagey's proposed reading of 35 P.S. § 6021.704(a), the "fraudulent or improper claims" language of that statute would be rendered meaningless. *See Commonwealth v. McCoy,* 599 Pa. 599, 613, 962 A.2d 1160, 1168 (2009) (stating that in construing a statute, "[w]e are not permitted to ignore the language of a statute, nor may we deem any language to be superfluous."). Accordingly, we conclude that by necessary implication, 35 P.S. § 6021.704(a) grants the Fund/Board the power to recoup payments, so long as the Fund/Board establishes that a claimant committed fraud in connection with a claim.

### C. Fraud

Gnagey also argues that the Fund failed to prove that it committed fraud by clear

and convincing evidence. In particular, Gnagey maintains that under 25 Pa.Code § 977.32(a)(1), it fully "cooperated" with the Fund's claim investigation, contending that it provided the Fund with every requested document; the Fund never asked whether there were orphan tanks at the site prior to the July 11, 2008 adjudication/settlement; and Gnagey disclosed the existence of all the orphan tanks [3] in February 27, 2009, when Mr. Moore specifically requested additional information related to unregistered USTs. Boiling Gnagey's arguments to their essence, Gnagey essentially contends that it had no cognizable legal duty to voluntarily disclose the fact that it discovered the orphan tanks until the Fund specifically requested such information.

Generally, as a matter of common law, the elements to prove a claim for fraud or deceit are a misrepresentation, a fraudulent utterance thereof, an intention to induce action thereby, justifiable reliance thereon, and damage as a proximate result. *Wilson v. Donegal Mutual Insurance Co.*, 410 Pa.Super. 31, 598 A.2d 1310, 1315 (1991).[4] To be actionable, a misrepresentation need not be in the form of a positive assertion but may be by concealment of that which should have been disclosed. *Id.* at 1315–16. *See Moser v. DeSetta*, 527 Pa. 157, 165, 589 A.2d 679, 682 (1991) (concluding that "the concealment of a material fact can amount to a culpable misrepresentation no less than does an intentional false statement."). However, while active concealment may constitute fraud, mere silence is not sufficient in the absence of a legal duty to disclose information. *Wilson*, 598 A.2d at 1315–16; *Smith*

*v. Renaut*, 387 Pa.Super. 299, 564 A.2d 188, 192 (1989). Otherwise, fraud by omission is actionable "only where there is an independent duty to disclose the omitted information." *Estate of Evasew*, 526 Pa. 98, 105, 584 A.2d 910, 913 (1990).

Pennsylvania law recognizes a difference between active concealment and mere silence in the context of common law fraud. *Wilson*, 598 A.2d at 1315–16; *Smith*, 564 A.2d at 192; *see American Planned Communities, Inc. v. State Farm Insurance Co.*, 28 F.Supp.2d 964, 968 (E.D.Pa.1998) (citing *Wilson*) (acknowledging that "[c]oncealment alone may create a sufficient basis for finding that a party engaged in fraud so long as the other elements of fraud are present."); *American Planned Communities, Inc.*, 28 F.Supp.2d. at 968 (citing *Roberts v. Estate of Barbagallo*, 366 Pa.Super. 559, 531 A.2d 1125 (1987) (noting that Pennsylvania common law subsumes and recognizes the tort of fraudulent concealment as stated in the Restatement (Second) of Torts § 550, which imposes liability for intentional concealment of material information regardless of any duty to disclose)), *and compare with Duquesne Light Company v. Westinghouse Electric Corporation*, 66 F.3d 604, 611 (3d Cir.1995) (applying Pennsylvania law) (reiterating that Pennsylvania has adopted the Restatement (Second) of Torts § 551, which imposes liability for fraudulent nondisclosure in those situations where there is an affirmative duty to speak/disclose, yet noting that Pennsylvania law is unclear as to when such a duty arises). While this Court is unable to locate any authority within our Commonwealth that expounds meaningfully upon

---

3. Throughout this opinion, we refer to the eight unregistered and abandoned/orphaned tanks interchangeably as the "abandoned," "orphaned," or "unregistered" tanks or USTs.

4. The elements of fraud must be proven by clear and convincing evidence. *Pittsburgh Live, Inc. v. Servov*, 419 Pa.Super. 423, 615 A.2d 438, 441 (1992).

the distinction between "active concealment" and "mere silence," and given the dichotomy evidenced by the above authorities, perhaps the best way to illustrate, on a surface level, the distinction is by comparing § 550 and § 551 of the Restatement (Second) of Torts. Section 550 states that liability occurs when "[o]ne party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information." On the other hand, section 551 imposes liability for nondisclosure of information when the defendant has a specific duty to disclose, which arises only in certain, enumerated circumstances.

In *United States v. Colton*, 231 F.3d 890 (4th Cir.2000), the United States Court of Appeals for the Fourth Circuit addressed the two legal concepts in a very detailed and scholarly manner. In so doing, the *Colton* court explained how and why the doctrine of "active concealment" constitutes fraud even if there is no independent legal duty to disclose the information, while the concept of "mere silence" requires the disclosure of information only if there is a positive statutory, regulatory, or legal duty mandating disclosure.

■ As the *Colton* court elucidated:
At common law, fraud has not been limited to those situations "where there is an affirmative misrepresentation or the violation of some independently-prescribed legal duty".... Rather, even in the absence of a fiduciary, statutory, or other independent legal duty to disclose material information, common-law fraud includes acts taken to conceal, create a false impression, mislead, or otherwise deceive in order to "prevent[] the other [party] from acquiring material information." Restatement (Second) of Torts § 550 (1977); *see also* W. Page Keeton et al., Prosser and Keeton on Torts § 106 (5th ed. 1984) ("Any words or acts

which create a false impression covering up the truth, or which remove an opportunity that might otherwise have led to the discovery of a material fact ... are classed as misrepresentation, no less than a verbal assurance that the fact is not true.").

Thus, fraudulent concealment, without any misrepresentation or duty to disclose can constitute common-law fraud. This does not mean, however, that simple nondisclosure similarly constitutes a basis for fraud. Rather, the common law clearly distinguishes between concealment and nondisclosure. The former is characterized by deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter. The latter is characterized by mere silence. Although silence as to a material fact (nondisclosure), without an independent disclosure duty, usually does not give rise to an action for fraud, suppression of the truth with the intent to deceive (concealment) does. *See, e.g., Stewart v. Wyoming Cattle Ranche Co.*, 128 U.S. 383, 388, 9 S.Ct. 101, 32 L.Ed. 439 (1888).

The Supreme Court in *Stewart* carefully explained why concealment is "equivalent to a false representation" and so appropriately forms the basis for a common law fraud action: "the concealment or suppression is in effect a representation that what is disclosed is the whole truth. The gist of the action is fraudulently producing a false impression upon the mind of the other party; and if this result is accomplished, it is unimportant whether the means of accomplishing it are words or acts of the defendant, or his concealment or suppression of material facts not equally within the knowledge or reach of the plaintiff." 128 U.S. at 388, 9 S.Ct. 101; *see also* ... 37

C.J.S. Fraud § 18 (1997) (distinguishing between silence and concealment); 37 Am.Jur.2d Fraud and Deceit § 145 (1968) (same). Thus, the common-law principle that, in the absence of an independent disclosure duty, "nondisclosure is not fraudulent, presupposes mere silence, and is not applicable where, by words or conduct, a false representation is intimated or any deceit practiced." *Id.* at § 174 (and the many cases cited therein); *see also* Stuart M. Speiser et al., 9 The American Law of Torts § 32:73 (1992).

Indeed, we have expressly held that the distinction between simple nondisclosure and concealment "is in accord with traditional principles of common law fraud." *Fox v. Kane–Miller Corp.*, 542 F.2d 915, 919 (4th Cir.1976). In *Fox*, we upheld the district court's reliance on the following explanation of this principle by Maryland's highest court:

Concealment and non-disclosure are closely related and in any given situation usually overlap.... When [either is] done without intent to mislead and without misrepresentation, it has no effect except where there is a duty of disclosure.... To create a cause of action, concealment must have been intentional and effective—the hiding of a material fact with the attained object of creating or continuing a false impression as to that fact. The affirmative suppression of the truth must have been with intent to deceive.

*Fegeas v. Sherrill*, 218 Md. 472, 147 A.2d 223, 225 (1958) (quoting Restatement of Restitution § 8 cmt. b (1937) and citing Restatement of Torts § 550 (1938)). Given this "close relationship" between nondisclosure and concealment, numerous decisions expressly distinguish between passive concealment— mere nondisclosure or silence—and active concealment, which involves the requisite intent to mislead by creating a false impression or representation, and which is sufficient to constitute fraud even without a duty to speak.

In short, at common law, no fiduciary relationship, no statute, no other independent legal duty to disclose is necessary to make active concealment actionable fraud—simple "good faith" imposes an obligation not to purposefully conceal material facts with intent to deceive. *Strong v. Repide*, 213 U.S. 419, 430, 29 S.Ct. 521, 53 L.Ed. 853 (1909); *Tyler v. Savage*, 143 U.S. 79, 98, 12 S.Ct. 340, 36 L.Ed. 82 (1892); *Stewart*, 128 U.S. at 388, 9 S.Ct. 101.

*Colton*, 231 F.3d at 898–99. *Accord, e.g.*, *Wells Fargo Bank v. Arizona Laborers*, 201 Ariz. 474, 38 P.3d 12, 21 (2002) (differentiating between mere silence or nondisclosure and intentional concealment and concluding that "[u]nlike simple nondisclosure, a party may be liable for acts taken to conceal, mislead or otherwise deceive, even in the absence of a fiduciary, statutory, or other legal duty to disclose.").

The *Colton* court's in-depth analysis is consistent with the observations made by our Superior Court in *Youndt v. First National Bank*, 868 A.2d 539 (Pa.Super.2005), and *Baker v. Cambridge Chase, Inc.*, 725 A.2d 757 (Pa.Super.1999). In *Youndt*, the Superior Court concluded that the tort of fraudulent concealment in the Restatement (Second) of Torts § 550 was not applicable because there was no allegation that the defendant in that case engaged in active concealment, but the court also stated that the defendant could be held liable for nondisclosure under the Restatement (Second) of Torts § 551 if an enumerated duty to disclose existed. 868 A.2d at 549–51. In *Baker*, the Superior Court noted that for purposes of the Restatement (Second) of Torts § 550, "con-

cealment or other action" occurs, *inter alia*, when there is "an intentional concealment of true facts which is calculated to deceive the other party." 725 A.2d at 769. Accordingly, we find the *Colton* court's commentary consonant with Pennsylvania law and persuasive. We further conclude that the above pronouncements regarding common law fraud are instructive in determining whether Gnagey committed fraud in connection with its claim to the Fund.

■ To recapitulate, in this case the Presiding Officer made the following pertinent findings with respect to Gnagey's conduct. Before the parties settled and/or adjudicated the claim, Gnagey discarded the abandoned tanks and the soil, and backfilled the excavated area without informing the Fund that it discovered the abandoned tanks. (Findings of Fact Nos. 65–99.) After discovering the orphan tanks, Gnagey changed its invoicing procedure to the Fund, opting not to disclose that UEG discovered and billed Gnagey for the abandoned tanks, and Gnagey instead issued three invoices to the Fund accompanied by photographs, narratives, and a chronology of daily work activities, all of which failed to document or disclose the abandoned tanks. (Findings of Fact Nos. 72–26, 92–93.) At a meeting on July 1, 2008, Breakwell inquired about the reasonableness of Gnagey's activities and the then unaccounted-for fifth registered tank, and he asked Gnagey about the "old tank field" area. Breakwell was informed by Gnagey and UEG that the field was an old foundation or cavity space, even though Gnagey and UEG knew that there were four abandoned tanks in that area and had already removed them several months before, in March 2008. (Findings of Fact Nos. 99, 122–124, 126–127.) Then, shortly after the parties settled and/or adjudicated the claim, Gnagey and UEG provided a site characterization report and remedial action plan to the Fund that failed to describe or depict the eight abandoned tanks; pursuant to DEP's regulations, the site characterization report was inaccurate because the eight unregistered tanks should have been disclosed as part of the site history. (Findings of Fact Nos. 148–154.) When Mr. Moore subsequently asked another serious of questions about the fifth registered tank, which remained unaccounted-for, Gnagey stated that it did not know the location of this tank and that it did not encounter any other storage tanks during its remediation activities. (Findings of Fact Nos. 155–156.) Mr. Moore then discovered a field note from UEG referencing that "the last UST [was] found yesterday," and he asked Gnagey about its location, condition, evidence of surrounding contamination, and whether Gnagey was aware of this orphan tank. In response, Gnagey admitted that it found one unregistered UST; however, Gnagey failed to mention that it discovered seven other unregistered tanks at this time and continued to request payment of the outstanding invoices. (Findings of Fact Nos. 157–161.)

Given these actions, the record supports the Presiding Officer's conclusion that Gnagey engaged in a pattern of active concealment that was designed to conceal the fact that there were eight unregistered tanks at the site. For purposes of imposing liability for intentional concealment of material information, even if there were no statutory requirement upon Gnagey to disclose the abandoned USTs to the Fund, the facts support the Presiding Officer's finding that Gnagey committed active concealment by engaging in "deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter." *Colton*, 231 F.3d at 898. Discerning no abuse of discretion or error of law on the part of the Presiding Officer in making his find-

ings or legal conclusions, we conclude that Gnagey's active concealment of the eight abandoned tanks constitutes fraud in connection with its claim to the Fund. *See also National Bldg. Leasing, Inc. v. Byler*, 252 Pa.Super. 370, 381 A.2d 963, 966 (1977) (concluding that the appellees/sellers fraudulently concealed material information when they demolished a number of buildings on the property, deposited the debris in a large hole located on the property, filled the hole with soil, and told the appellants/buyers that the debris from the demolished buildings had been removed from the premises).

In a somewhat contradictory manner, Gnagey also argues that the Fund could not have reasonably relied upon any of its misrepresentations because the Fund possessed suspect information when it processed the claim and could have explored the underlying issues and discovered the unregistered, orphan tanks. This contention is patently meritless. Even if the Fund was in possession of suspect information, the fact remains that due to Gnagey's active concealment, the Fund was never placed with sufficient inquiry notice, or provided with specific information that could have led it to reasonably believe, that the orphan tanks were located at the site prior to the July 11, 2011 determination. Indeed, when Mr. Moore inquired about the fifth on-site regulated UST, Gnagey represented that UEG did not encounter any other storage tank apart from the four registered tanks that were indicated in the closure report. Moreover, pursuant to 25 Pa.Code § 977.32(b), a claimant must "cooperate in all respects with the Fund . . . during the investigation and resolution of a claim," and, as the Presiding Officer found, the Fund must assume that Gnagey was acting in good faith when it provided its information.

Moreover, we conclude that under the facts of this case, the record also supports fraudulent nondisclosure when there was an affirmative duty to disclose. The regulations at 25 Pa.Code § 977.32(a)(1) and (b) imposed upon Gnagey a legal duty to disclose that eight abandoned tanks were located at the site. Under 25 Pa. Code § 977.32(b), a claimant has a general duty to "cooperate in all respects with the Fund [and its agents] during the investigation and resolution of a claim." Pursuant to 25 Pa.Code § 977.32(a)(1), "at a minimum," a claimant must cooperate by providing "all information requested by the Fund including" certain documents "and other information pertinent to a claim."

Contrary to Gnagey's narrow interpretation, these regulations do not require the Fund to specifically request information regarding unknown orphan tanks in order to trigger Gnagey's obligation to disclose that which it concealed from the Fund. Rather, the import of 25 Pa.Code § 977.32(a)(1) and (b) mandates that during the investigation of a claim, a claimant must "cooperate" by revealing all information in its possession that falls within the scope of the request and additional information that is generally associated with the request and is reasonably likely to be germane to the claim. To interpret 25 Pa.Code § 977.32(a)(1) in a more restrictive manner, as Gnagey suggests, would eviscerate the terms "including," "other," and "pertinent," which connote that in a request for information, a claimant will not only disclose, in a technical sense, the precise information requested, but also supplemental and related information that is relevant to the request and resolution of the claim. *See* 2A N. Singer & J. Singer, Sutherland Statutory Construction § 47.7 at 305 (7th ed. 2007) ("[T]he word 'includes' is usually a term of enlargement, and not of limitation."); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 1598

(Gove, ed. 1986) (defining "other" *inter alia* as "an additional one"); *id.* at 1688 (defining "pertinent," *inter alia,* as having "some connection or relation with something"). In addition, the construction proposed by Gnagey would have the practical effect of undermining the definition and spirit of "cooperating in all respects;" this concept naturally entails a duty of good faith and fair dealing while Gnagey and the Fund work toward the common goal of remediating the site in an efficient/thorough manner and reimbursing expenditures that are rightfully covered under the Tank Act. *See* BLACK'S LAW DICTIONARY 773 (9th ed. 2009) (defining "cooperation," *inter alia,* as "[a]n association of individuals who join together for a common benefit.").

██ Here, as noted above, Mr. Moore questioned Gnagey about the then unaccounted-for fifth registered tank on two occasions, and Gnagey disclaimed any knowledge of this tank or any other tank. (Findings of Fact Nos. 99, 122–24, 126–27, 155–56.) After Mr. Moore located the field note stating that the "last UST was found," he requested information about this orphan tank **and** evidence of surrounding contamination in the area, and Gnagey, for the first time, provided information regarding one abandoned tank, but failed to disclose the fact that it discovered seven other orphan tanks nearby. (Findings of Fact Nos. 157–61; R.R. at 1650a–51a.) In the context of Mr. Moore's request for this information, Gnagey's limited disclosure was insufficient because the failure to disclose the existence of the seven other orphan tanks constituted a breach of Gnagey's duties to cooperate with the Fund and disclose pertinent information under 25 Pa.Code § 977.32(a)(1) and (b).

Consequently, even if Gnagey engaged in "mere passive silence," Gnagey's activities nonetheless constituted fraud by omission based upon its failure to fulfill its affirmative duties of disclosure per 25 Pa.Code § 977.32(a)(1) and (b).

Next, Gnagey contends that the eight orphan tanks it discovered cannot be categorized as USTs and, therefore, it was not required to disclose them to the Fund. Gnagey claims that pursuant to 25 Pa. Code. § 977.4,[5] a UST does not include a tank that has a *de minimis* concentration of a regulated substance, and that there is no evidence the orphan tanks contained any regulated substances or contributed to the contamination.

Further, according to Gnagey, DEP issued a "Guidance" explaining that underground tanks are not regulated and need not be reported if they were emptied and remained out of operation before December 22, 1988, and do not pose a current or potential threat to human health and the environment. Gnagey asserts that the orphan tanks have been out of operation since the 1970s, were not a source of contamination, and do not pose a threat to human health.

For these reasons, Gnagey submits that it complied with applicable regulations and, consequently, the Board was prohibited from finding that Gnagey committed fraud in connection with its claim.

Having already concluded that the Presiding Officer did not abuse his discretion in finding and concluding that Gnagey actively concealed or failed to disclose the abandoned USTs in a fraudulent manner, Gnagey's arguments are only relevant insofar as they shed light on the intent to

---

**5.** This regulation defines a "UST" as "[a]ny one or a combination of tanks (including underground pipes connected thereto) which are used to contain an accumulation of regulated substances, and the volume of which (including the volume of underground pipes connected thereto) is 10% or more beneath the surface of the ground."

deceive element of fraud. Although Gnagey claims that the behavior of it and UEG was innocuous, the Presiding Officer, as fact-finder, was not convinced and found any testimony to this effect not credible. (Presiding Officer's Recommendation at 47–48 and n.3).

Because the Presiding Officer rejected the notion that Gnagey reasonably believed that it was complying with DEP's Guidance and 25 Pa.Code § 977.4, we are left with the fact that Gnagey unilaterally determined that the orphan tanks did not meet the definition of a UST and did not contain any contamination. By deciding to discard the orphan tanks and surrounding soil, Gnagey deprived the Fund of a full opportunity to analyze them or make an informed decision as to whether the orphan tanks and/or surrounding soil were a potential threat to human health; whether they contained (or at one time contained) a regulated substance; whether the orphan tanks were a source of contamination; and whether any contamination pre-dated the effective date for eligibility, February 1, 1994. (Presiding Officer's Recommendation at 50–51.) Nonetheless, the Presiding Officer found as fact that Mr. Moore attempted to obtain for testing the section of the registered tank containing the crack from which Gnagey and UEG claimed that all the contamination originated, but UEG would not provide a section to Mr. Moore. The Presiding Officer further found as fact that the area excavated in the vicinity of the abandoned tanks is approximately three times greater than the area excavated in the vicinity of the registered tanks; that the two tankfields containing four of the abandoned tanks corresponded with areas of heavy contamination and excavation; and finally, that photographic evidence depicted obvious and heavy contamination of the soil under and around the abandoned tanks. (Findings of Fact Nos. 66–67, 163, 171–73.)

As evidenced from our analysis above, the record supports the Presiding Officer's finding that Gnagey engaged in active concealment and/or fraud by omission with the intent to deceive the Fund and prevent it from discovering the existence of the eight orphan tanks. It matters not that there may be evidence in the record that could support a different finding or conclusion. *See Waldameer Park, Inc. v. Workers' Compensation Appeal Board (Morrison)*, 819 A.2d 164, 168 (Pa.Cmwlth.2003) (stating that it is immaterial that there is evidence in the record supporting a factual finding contrary to that made by the fact-finder so long as there is substantial evidence to support the factual finding actually made). In sum, there was no discernible error from the record on the part of the Presiding Officer, as fact-finder, in assessing and rejecting Gnagey's proffered excuse that it made a good-faith attempt to comply with the law and reasonably believed that it was not required to disclose the existence of the abandoned USTs. *See MKP Enterprises, Inc. v. Underground Storage Tank Indemnification Board*, 39 A.3d 570, 588 (Pa.Cmwlth.2012) (discussing the presiding officer's role as fact-finder).

■ We also note that Gnagey's reliance on DEP's Guidance in an attempt to prove that it complied with the applicable law is misplaced. First, DEP and the Fund are separate agencies with different purposes under the Tank Act—DEP regulates the installation, operation, and closure of USTs and implements corrective action, while the Fund determines whether or not an event is eligible for reimbursement. Second, the Guidance is not a law or regulation, but, rather, is a statement of policy that does not carry the force of law. (R.R. at 1720a.) ("The policies and procedures herein [*i.e.*, the Guidance] are not an adjudication or a regulation. There is no

intent on the part of DEP to give the rules in these policies that weight or deference. This document establishes the framework within which DEP will exercise its administrative discretion in the future. DEP reserves the discretion to deviate from this policy statement if circumstances warrant."). *See Northwestern Youth Services, Inc. v. Department of Public Welfare,* 1 A.3d 988, 993 (Pa.Cmwlth.2010) (stating that a statement of policy announces the agency's tentative intentions for the future and does not have the binding effect of law).

Accordingly, we conclude that the Presiding Officer did not err in determining that Gnagey committed fraud by active concealment and/or omission and that, therefore, the Fund was entitled to recoup payments made to Gnagey pursuant to section 704(a)(1) of the Tank Act.

### D. Res Judicata

Finally, Gnagey argues that the doctrine of res judicata bars the Fund from seeking recoupment because the Fund adjudicated Gnagey's claim for coverage in the July 11, 2008 letter. Gnagey asserts that the Fund cannot bring its recoupment action on the ground that the July 11, 2008 adjudication is a conclusive bar to any subsequent action involving the claim or issue of whether Gnagey is entitled to coverage. In response, the Fund contends that its July 11, 2008 letter was a settlement agreement, as opposed to a formal adjudication, and claims that fraudulent conduct abrogates a settlement agreement as a matter of contract law.

■ The doctrine of res judicata applies to administrative adjudications and bars re-litigation of a claim when the cause of action in one proceeding is identical to that involved in a prior final judgment.

*D.Z. v. Bethlehem Area School District,* 2 A.3d 742, 749 (Pa.Cmwlth.2010). An "adjudication" is defined by the Administrative Agency Law[6] as: "[A]ny final order, decree, decision, **determination** or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any or all of the parties to the proceedings in which the adjudication is made." 2 Pa.C.S. § 101 (emphasis added).

■ Based on this definition, we conclude that the July 11, 2008 letter was an adjudication because it was a final, unappealed determination of Gnagey's statutory rights to reimbursement under the Tank Act.

■ The July 11, 2008 letter clearly was a "final determination" that Gnagey was eligible for coverage from the Fund for 70% of the remediation expenses it incurred, which is obvious from the language of the letter itself. The Letter states that "[i]n the event our **determination is not acceptable and you wish to appeal it, you must request a review with the [Board] within 35 days**" and informed Gnagey that failure to do so would result in **"forfeiture of [Gnagey's] appeal rights."** (R.R. at 773a–74a) (emphasis added). As evidenced by the foregoing, the July 11, 2008 letter also contained a notice of forfeiture of appeal rights. Notwithstanding this, no appeal was taken, which made the determination of fund coverage final. However, our conclusion that the July 11, 2008 letter is a final adjudication does not bar the Fund's recoupment action in this case. Under Pennsylvania law, an adjudication will be set aside if it is proven that the adjudication was the product of fraud, and once set aside on account of fraud, the adjudication does not have res judicata effect. *Jacque-*

6. 2 Pa.C.S. §§ 501–508, 701–704.

*lin v. Zoning Hearing Board of Hatboro Borough,* 152 Pa.Cmwlth. 568, 620 A.2d 554, 557–58 (1993).

Notwithstanding the foregoing, if the party complaining of fraud could have raised the issue of fraud prior to the entry of the adjudication and did not, or could have ascertained the facts through the exercise of reasonable diligence, the adjudication will not be set aside. *See Bata v. Central–Penn National Bank,* 423 Pa. 373, 383, 224 A.2d 174, 181 (1966); *Jacquelin,* 620 A.2d at 557–58. Hence, if the July 11, 2008 adjudication is not to be given res judicata effect, so as to not bar the Fund's claim for recoupment, it must be because of a fraud perpetrated by Gnagey and that the Fund did not know, and through the exercise of reasonable diligence could not have known, about the abandoned tanks until after the July determination letter was issued.

Here, as detailed above, the Presiding Officer did not err in finding that Gnagey engaged in fraudulent conduct prior to the Fund issuing its July 11, 2008 determination and that the Fund did not learn of the abandoned tanks until well after the time to appeal the determination had passed. Further, the findings by the Presiding Officer clearly show that Gnagey fraudulently concealed the existence and its removal of the abandoned tanks and frustrated the Fund's due diligence efforts to evaluate Gnagey's claim for remediation expenses. Because of Gnagey's fraud and active concealment of the true condition of the site, which included the removal of four abandoned tanks but then subsequently stating that it believed the area from which the tanks were removed to be a building foundation, as well as removing massive amounts of contaminated soil and then backfilling the area, the Fund's efforts to ascertain the merits of Gnagey's claim were frustrated. As the Presiding Officer found, under the circumstances of this case, "the Fund had no choice but to rely upon [Gnagey's] information." Indeed, had not Gnagey's attorney, immediately upon receiving information from Gnagey about the abandoned tanks, initiated a meeting with Mr. Moore on February 27, 2009 (more than seven months after the determination letter) and provided him with a site map depicting the abandoned tanks and 59 photographs showing their removal, the Fund would not have learned of their previous existence. In other words, until Gnagey's attorney was finally provided with this information, which the attorney forthwith provided to the Fund, the Fund would not have the information.

Accordingly, because Gnagey's fraudulent acts not only prevented the Fund from knowing the true condition of the site but also thwarted the Fund's due diligence efforts to ascertain the site's true condition, we conclude that the Fund could not have ascertained the existence of the abandoned tanks prior to payment to Gnagey and hence that the doctrine of res judicata does not prohibit the Board's instant action.[7]

### Conclusion

For the above-stated reasons, we conclude that the record supports the Presiding Officer's findings of fact and credibility determinations, and that the Presiding Officer did not err in concluding that Gnagey

---

**7.** Moreover, even if the July 11, 2008 letter is deemed to be a settlement agreement, for the same reasons stated above, Gnagey's fraudulent conduct abrogates the settlement agreement and strips it of res judicata effect. *McDonnell v. Ford Motor Co.,* 434 Pa.Super. 439, 643 A.2d 1102, 1106–07 (1994). *See Iacoponi v. Plisko,* 412 Pa. 576, 581, 195 A.2d 362, 365 (1963); *Simpson v. Allstate Insurance Co.,* 350 Pa.Super. 239, 504 A.2d 335, 337–38 (1986).

engaged in fraudulent concealment and/or fraud by omission. We further conclude that the Presiding Officer did not commit legal error in concluding that the Fund has the statutory authority to recoup payments made as a result of fraudulent claims, and that res judicata does not bar the ·Fund's recoupment action. Discerning neither an abuse of discretion nor an error of law on the part of the Presiding Officer, we affirm the June 21, 2012 order of the Board adopting the Presiding Officer's report and recommendation.

### ORDER

AND NOW, this 6th day of December, 2013, the June 21, 2012 adjudication and order of the Underground Storage Tank Indemnification Board is affirmed.